[Cite as *State v. Logan*, 2017-Ohio-8932.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

EVRED J. LOGAN,

    DEFENDANT-APPELLANT.

CASE NO. 1-16-28

O P I N I O N

Appeal from Allen County Common Pleas Court
Trial Court No. CR20160002

Judgment Affirmed

Date of Decision: December 11, 2017

APPEARANCES:

    *Terrence K. Scott* **for Appellant**

    *Terri L. Kohlrieser* **for Appellee**

**PRESTON, P.J.,**

{**¶1**} Defendant-appellant, Evred J. Logan ("Logan"), appeals the May 9, 2016 judgment entry of sentence of the Allen County Court of Common Pleas. For the reasons that follow, we affirm.

{**¶2**} This case stems from an agreement between Logan and Timothy Cole ("Cole") and Jenna Shofner ("Shofner")[1] in which Logan agreed to provide Cole and Shofner heroin in exchange for performing renovation-work at Logan's house. Unsurprisingly, the agreement soured and Logan allegedly compelled Cole and Shofner to perform renovation work at his house against their will on December 27-29, 2015.

{**¶3**} On February 11, 2016, the Allen County Grand Jury indicted Logan on three counts, including: Count One of kidnapping in violation of R.C. 2905.01(A)(6), (C)(1), a first-degree felony; Count Two of kidnapping in violation of R.C. 2905.01(A)(6), (C)(1), a first-degree felony; and Count Three of felonious assault in violation of R.C. 2903.11(A)(1), (D)(1)(a), a second-degree felony. (Doc. No. 3). Counts One and Two of the indictment include a specification under R.C. 2941.145(A) alleging that Logan committed the offenses with a firearm. (*Id.*).

{**¶4**} On February 19, 2016, Logan appeared for arraignment and entered pleas of not guilty. (Doc. No. 12).

---

[1] Jenna Shofner is n.k.a. Jennifer Cole. (*See* Mar. 28-30, 2016 Tr., Vol. I, at 62).

**{¶5}** Prior to the start of trial, Logan's trial counsel informed the trial court that Logan wished to proceed pro se. (Mar. 28-30, 2016 Tr., Vol. I, at 4-5). The trial court conducted an ex parte hearing with Logan and his trial counsel regarding Logan's reasoning for his decision, then discussed, on the record, Logan's decision to represent himself at trial. (*See id.* at 6-22, 23-31). After Logan singed a waiver of counsel, the trial court permitted him to represent himself. (*Id.* at 32); (Doc. No. 62).

**{¶6}** The case proceeded to a jury trial on March 28-30, 2016. (Mar. 28-30 Tr., Vol. I, at 1); (Mar. 28-30, 2016 Tr., Vol. II, at 263, 348). On March 30, 2016, the jury found Logan guilty of the counts in the indictment and not guilty as to the specifications in the indictment. (Doc. Nos. 66, 67, 68, 70); (Mar. 28-30, 2016 Tr., Vol. II, at 348-352). The trial court filed its judgment entry of conviction that same day. (Doc. No. 70). On May 9, 2016, the trial court sentenced Logan to 4 years in prison on Count One, 4 years in prison on Count Two, and 7 years in prison on Count Three, and ordered that Logan serve the terms consecutively for an aggregate sentence of 15 years in prison. (Doc. No. 73).

**{¶7}** On June 8, 2016, Logan filed his notice of appeal. (Doc. No. 76). He raises two assignments of error for our review.

### Assignment of Error No. I

**The trial court violated Evred J. Logan's rights to due process and a fair trial when, in the absence of sufficient evidence, Mr.**

**Logan was convicted of Counts 1 and 2, kidnapping. Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution. (Tr. p. 78-80, 84, 87, 88, 89, 152, 153, 157, 194, 201, and 203; May 9, 2016 Sentencing Hearing Tr. p. 13 and 14).**

{¶8} In his first assignment of error, Logan argues that his kidnapping convictions are based on insufficient evidence.[2] Specifically, Logan argues that there is insufficient evidence that he restrained Cole's and Shofner's liberty and that there is insufficient evidence that he purposefully held Cole and Shofner in a condition of involuntary servitude.

{¶9} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v.*

---

[2] Logan does not challenge the sufficiency of the evidence supporting his conviction as to Count Three.

-4-

*Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *Thompkins* at 386.

{¶10} Logan was convicted of two counts of kidnapping in violation of R.C. 2905.01(A)(6), which provides, in relevant part:

> (A) No person, by force, threat, or deception * * * shall * * * restrain
>
> the liberty of the other person, for any of the following purposes:
>
> * * *
>
> (6) To hold in a condition of involuntary servitude.

{¶11} Because they are the only elements Logan challenges on appeal, we will address only whether the evidence, when viewed in a light most favorable to the prosecution, is such that a rational trier of fact could have found that: (1) Logan restrained Cole's and Shofner's liberty; and (2) Logan purposefully held Cole and Shofner in a condition of involuntary servitude.

{¶12} "Restraining an individual's liberty means limiting or restraining their freedom of movement. The restraint need not be for any specific duration or in any specific manner." *State v. Williams*, 10th Dist. Franklin No. 16AP-540, 2017-Ohio-5598, ¶ 19, citing *State v. Taylor*, 10th Dist. Franklin No. 14AP-254, 2015-Ohio-

2490, ¶ 18, citing 2 *Ohio Jury Instructions*, CR Section 505.01(A) (Rev. Jan. 20, 2007).

> A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature.

R.C. 2901.22(A).

{¶13} R.C. 2905.01(D) provides that "involuntary servitude" has the same meaning as in R.C. 2905.31. R.C. 2905.31 defines "involuntary servitude" as "being compelled to perform labor or services for another against one's will." R.C. 2905.31(A). The phrase "involuntary servitude" as an element of kidnapping has not been interpreted either before or after the General Assembly enacted Sub.S.B. No. 235.[3] *Compare State v. Nelson*, 8th Dist. No. 104795, 2017-Ohio-6883, ¶ 47 (noting that "[t]here is not a lot of case law interpreting the phrase 'involuntary servitude' as an element of abduction either before or after the General Assembly enacted Am.Sub.S.B. No. 235" and inability to find "any cases addressing the

---

[3] Although prior versions of Ohio's kidnapping statute included the phrase "involuntary servitude" as an element of a kidnapping offense, that phrase was not defined by the Ohio Revised Code. *See, e.g.*, R.C. 2905.01 (1996) (current version at R.C. 2905.01 (2011)). In 2010, the General Assembly amended R.C. 2905.01 by moving the involuntary-servitude element from R.C. 2905.01(B) to 2905.01(A) and defining the phrase under R.C. 2905.01(D). *Compare* R.C. 2905.01 (1996) *with* R.C. 2905.01 (2010). *See Trafficking in Persons—Involuntary Servitude—Offense of Conspiracy*, Sub.S.B. No. 235, 2010 Ohio Laws File 58.

definition of 'involuntary servitude, as set forth in R.C. 2905.31"). Construing the definition of involuntary servitude under R.C. 2905.31, the Eighth District Court of Appeals "look[ed] to the intent of the legislature when it enacted []Sub.S.B. No. 235," which was Ohio's "first anti-trafficking law." *Id.* at ¶ 46; Rocha, *Our Backyard Slave Trade: The Result of Ohio's Failure to Enact Comprehensive State–Level Human–Sex Trafficking Legislation*, 25 J.L. & Health 415, 416 (2012). Because the definition of involuntary servitude is intertwined with the topic of human trafficking, we must review the historical roots of that topic.

{¶14} "Human trafficking legislation is rooted in the Thirteenth Amendment to the United States Constitution, which expressly states that '[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.'" Rocha at 425, quoting the Thirteenth Amendment. "Similarly, the Ohio Constitution states that '[t]here shall be no slavery in this state; nor involuntary servitude, unless for the punishment of crime.'" *Nelson* at ¶ 48, quoting the Ohio Constitution.

{¶15} "In 1948, Congress enacted Section 1582 of the United States Code to consolidate previous anti-slavery statutes and to criminalize involuntary servitude." Rocha at 425, citing 18 U.S.C. 1584. However, because Congress did not define

the phrase "involuntary servitude," "courts were left to interpret Congress' intent." *Id.*, citing 18 U.S.C. 1584.

> Courts have defined the phrase "involuntary servitude" * * * under the Thirteenth Amendment in various contexts. In *U.S. v. Kozminski*, the United States Supreme Court explained that "involuntary servitude" exists if a person is forced to work "by the use or threatened use of physical or legal coercion."

*Nelson* at ¶ 49, quoting 487 U.S. 931, 943-944, 108 S.Ct. 2751 (1988). In that case, the Supreme Court concluded that "Congress' original intent was to forbid conditions prevalent during the African Slave trade, namely compulsory labor." Rocha at 425, citing *Kozminski* at 942-943.

The Eighth District further documented:

> In *Rowe v. Elyria*, a property owner complained * * * that enforcement of a city mowing ordinance subjected him to involuntary servitude in violation of the Thirteenth Amendment to the United States Constitution. The property owner complained that forcing him to mow the grass or pay a fine could be characterized as a "badge or incident of slavery." Citing *Kozminski*, the Sixth Circuit explained that while the Thirteenth Amendment was not limited to the abolishment of African slavery, the phrase "involuntary servitude"

was intended to cover forms of compulsory labor akin to African slavery that "in practical operation would tend to produce like undesirable results." The Sixth Circuit concluded[,] "While we have not located any cases discussing the imposition of charges for failing to maintain property, we conclude that even if the tree lawn is owned by the city enforcement of the mowing ordinance does not involve the kind of compulsion that would constitute involuntary servitude under the Thirteenth Amendment."

*Nelson* at ¶ 50, quoting *Rowe v. Elyria*, 38 Fed.Appx. 277, 283 (6th Cir.2002). The Eighth District further documented:

The [United States District Court for the Northern District of Ohio] in *Midwest Retailer Associated, Ltd. v. Toledo*, expressed a similar interpretation of the phrase "involuntary servitude," stating that "[t]he contemporary view is that involuntary servitude claims, to be cognizable, relate to extreme cases, such as labor camps, isolated religious sects, and forced confinement."

*Id.* at ¶ 51, quoting *Midwest Retailer Associated, Ltd. v. Toledo*, 563 F.Supp.2d 796, 809 (N.D.Ohio 2008), citing *Alkire v. Irving*, 330 F.3d 802, 816-817 (6th Cir.2003) ("explaining that when defendant is indigent, imprisonment for failure to pay fines is a violation of the Thirteenth Amendment"), *United States v. King*, 840 F.2d 1276,

1280 (6th Cir.1988) ("members of religious sect 'repeatedly used and threatened to use physical force to make the children [at their camp] perform labor and the children believed they had no viable alternative but to perform such labor'"), *Jobson v. Henne*, 355 F.2d 129, 131-132 (2d Cir.1966) ("patients in mental institution performing required labor stated claim for violation of Thirteenth Amendment"), and *Santiago v. City of Philadelphia*, 435 F.Supp. 136, 156-157 (E.D.Pa.1977) ("refusing to dismiss Thirteenth Amendment claim filed by juveniles detained and forced to work at a youth service center").

{¶16} From there, the Eighth District addressed the human-trafficking purpose behind Sub.S.B. 235 and noted that "'trafficking refers to the elements of "fraud, force, or coercion" that result in the victim's inability to escape the traffickers' control." *Id.* at ¶ 55, quoting Rocha at 420. *See also* Rocha at 420 ("traffickers compel victims * * * through a variety of coercive measures, including the use of brutal violence, threats of deportation, and threats of violence against family members."). Although the topic of human trafficking most often rears its head when discussing sex crimes, the involuntary-servitude prohibition under R.C. 2905.01 does not require the compulsion of sexual acts. *See Nelson* at ¶ 55, quoting Rocha at 421 ("'Human trafficking can be either sex trafficking or labor trafficking.'"). Indeed, as the Eighth District espoused, the historical roots of human-trafficking legislation stem from the intent to criminalize forced labor.

"'Labor trafficking may consist of forced labor, debt bondage, involuntary domestic servitude, and forced child labor.'" *Id.*, quoting Rocha at 421, citing 18 U.S.C. 1589 and 22 U.S.C. 7102. As such, inherent in the definition of involuntary servitude—"being compelled to perform labor or services for another against one's will"—are the concepts underlying the labor-trafficking component of human trafficking. *Compare* R.C. 2905.31(A) *with* 18 U.S.C. 1589 and 22 U.S.C. 7102(6).

**{¶17}** Logan argues that the State failed to prove that he restrained the liberty of Cole and Shofner for the purpose of holding them in a condition of involuntary servitude because Logan "was extracting retribution [against Cole and Shofner] for stealing the pills" when Logan "orchestrated the fight between Ms. [Valerie] Johnson [("Johnson")] and Ms. Shofner." (Appellant's Brief at 8). We disagree. The State presented sufficient evidence that Logan restrained Cole's and Shofner's liberty with the purpose of holding them in a condition of involuntary servitude. That is, based on the testimony presented at trial, a rational juror could conclude that Logan limited or restrained Cole's and Shofner's freedom of movement for the purpose of performing labor or services against their will.

**{¶18}** Shofner testified at trial that she became acquainted with Logan during the summer of 2015. (Mar. 28-30, 2016 Tr., Vol. II, at 182-183). Cole was introduced to Logan in November or December of 2015. (Mar. 28-30, 2016 Tr., Vol. I, at 61, 70). Logan became Cole's and Shofner's heroin dealer. (*Id.* at 70).

According to Cole, in exchange for Logan providing him heroin, Cole agreed to renovate portions of Logan's house. (*Id.* at 71-74). Cole testified that his arrangement with Logan was copacetic at first but began to sour around Christmas 2015. (*Id.* at 73-81).

{¶19} Shofner testified that she and Cole went to Logan's house on December 27 "to work on his house" and to take "some pills over to trade him" for heroin. (Mar. 28-30, 2016 Tr., Vol. II, at 189-190). (*See also* Mar. 28-30, 2016 Tr., Vol. I, at 82-83). After they gave Logan the pills, Logan refused to give them heroin. (Mar. 28-30, 2016 Tr., Vol. II, at 190-191). (*See also* Mar. 28-30, 2016 Tr., Vol. I, at 82-84). Cole protested. (Mar. 28-30, 2016 Tr., Vol. II, at 191). According to Shofner, in response to Cole's protest, Logan said, "'Are we going to have a problem? You can either stay and work or you can take this ass whipping and leave.'" (*Id.*). (*See also* Mar. 28-30, 2016 Tr., Vol. I, at 84). After that exchange, Logan "went to go get in the shower and asked [them] if he was going to have to worry about [their] running off, and [Cole and Shofner] told him 'no.'" (Mar. 28-30, 2016 Tr., Vol. II, at 191). (*See also* Mar. 28-30, 2016 Tr., Vol. I, at 84). Cole and Shofner "grabbed the four pills" and left. (Mar. 28-30, 2016 Tr., Vol. II, at 191-192).

{¶20} Cole testified that Logan contacted him by text message later that day and "said that if [they] came back he would pay [them]." (Mar. 28-30, 2016 Tr.,

Vol. I, at 86). Cole responded to Logan that he did not want to return to his house because he "was afraid that he was going to punch [him], or try to harm [him]." (*Id.*). Cole testified that Logan "said that he wasn't [going to hurt him], that he just wanted to get the work done." (*Id.*). Based on Logan's assurance, Cole and Shofner returned to Logan's house, but Logan was not at the house when they arrived. (*Id.* at 86-87). (*See also* Mar. 28-30, 2016 Tr., Vol. II, at 192-193). When Logan arrived, he implied that he "tricked" Cole and Shofner into returning to his house. (Mar. 28-30, 2016 Tr., Vol. I, at 87) (Cole testified that Logan said, "You fell for my little trap"); (Mar. 28-30, 2016 Tr., Vol. II, at 194) (Shofner testified that Logan asked, "'Do you guys like how I tricked you?'"). Then, Johnson appeared. (Mar. 28-30, 2016 Tr., Vol. I, at 87); (Mar. 28-30, 2016 Tr., Vol. II, at 194). Shofner knew she "was in trouble" because Logan "threatened [her] with [Johnson] before by saying "things like, 'Don't make me have to sic [Johnson] on your ass.'" (Mar. 28-30, 2016 Tr., Vol. II, at 194). When Shofner saw Johnson, she dialed 911. (*Id.*).

{¶21} Shofner testified, "[Johnson] hit [Cole] a few times" but Logan instructed Johnson, "'Don't hit him. Hit her,'" with which Johnson complied. (*Id.* at 195). When Johnson began assaulting Shofner, Cole "tried to go through the [front] door" but he "and Logan struggled at the door for a minute and then [Logan] was able to keep [Cole] inside." (Mar. 28-30, 2016 Tr., Vol. I, at 88). Logan "had Johnson take [Shofner] to the kitchen and beat on her in there." (*Id.*). While

Johnson was assaulting Shofner in the kitchen, Logan, with a firearm in his waistband, told Cole, "I knew it would hurt you more if I had her beat." (*Id.* at 89-90). Shofner recalled that Logan had a gun "in his hand" while Johnson was assaulting her and that Logan threatened to "shoot [Cole's] mom's house up." (Mar. 28-30, 2016 Tr., Vol. II, at 198-199). Shofner lost consciousness as a result of the assault. (Mar. 28-30, 2016 Tr., Vol. I, at 95).

{¶22} When Shofner regained consciousness, Logan "wanted [Cole] to get back to work [painting a door]. So, [Cole] followed suit and went back to work" because he "was pretty scared and shook up." (*Id.* at 96). Shofner testified that, after the assault, Cole was painting and she "tried to work as much as [she] could" because she "was afraid" and "didn't want to get hurt again." (Mar. 28-30, 2016 Tr., Vol. II, at 199). Shofner "was mainly picking up after [Cole], like there was sawdust or drywall dust on the floor and she would sweep it up and pick it up, but just stuff of that nature." (Mar. 28-30, 2016 Tr., Vol. I at 97). Cole and Shofner remained at Logan's house while Cole "finished texturing, putting a finished texture on the ceiling[,] sand[ing] the walls[, and] paint[ing] the upstairs bedroom, the kitchen, and the front room." (*Id.* at 96-97). Indeed, Cole testified that he "worked all night" on December 27 and continued working until "roughly midnight" on December 28. (*Id.* at 98, 101). Shofner testified that she and Cole eventually fell asleep "for an hour or two" before they were woken by Logan the morning of

December 28 demanding that they "'get to work.'" (Mar. 28-30, 2016 Tr., Vol. II, at 200). On December 28, Cole testified that he "finished up doors[,] mounted a bathroom sink[, and] did some work in the basement[, along with] some other little stuff that needed to be finished." (Mar. 28-30, 2016 Tr., Vol. I, at 99).

{¶23} Cole testified that Logan told Cole, while Cole was working, that "he could have someone come to [Cole's] mom's house and shoot her house." (*Id.* at 97-98). Based on Logan's threat, Cole "was pretty scared at that time to try to leave or anything like that." (*Id.* at 98). According to Shofner, she did not think she could leave the house without being harmed. (Mar. 28-30, 2016 Tr., Vol. II, at 200).

{¶24} Cole testified that Logan allowed Shofner to leave the house on December 28 "to go to the [Children Services] office to visit with [their] son." (*Id.* at 99-100). (*See also* Mar. 28-30, 2016 Tr., Vol. II, at 200-201). Shofner testified that Logan did not want her to leave but eventually agreed to let her go provided that she promise not to go to the police. (Mar. 28-30, 2016 Tr., Vol. II, at 201). According to Cole, Logan "stressed the fact that he didn't want her to go to the cops." (Mar. 28-30, 2016 Tr., Vol. I, at 100). Logan did not permit Cole to leave with Shofner because "[h]e wanted [Cole] to finish the work on his house." (*Id.* at 100). Shofner did not report the assault to anyone when she went to visit her son and returned to the house because she "was afraid" Logan would "hurt" Cole, Cole's

mother, or Shofner. (*Id.* at 201-202). (*See also* Mar. 28-30, 2016 Tr., Vol. I, at 101).

**{¶25}** Ultimately, to escape from Logan's house, Shofner and Cole concocted a plan in which they saved their cell-phone number in their cell-phone under Cole's boss's name and sent a text message as if Cole's boss were requesting that Cole report to work. (Mar. 28-30, 2016 Tr., Vol. II, at 205-207). (*See also* Mar. 28-30, 2016 Tr., Vol. I, at 101). The plan worked, and Logan allowed them to leave. (Mar. 28-30, 2016 Tr., Vol. II, at 208). (*See also* Mar. 28-30, 2016 Tr., Vol. I, at 102).

**{¶26}** Construing the evidence in a light most favorable to the prosecution, the testimony summarized above would allow a rationale trier of fact to conclude that Logan restrained Cole's and Shofner's liberty. Logan struggled with Cole to prevent him from leaving the house, and Logan instructed Johnson to attack Shofner, which caused Shofner to sustain severe injuries. *See State v. Dzelajlija*, 8th Dist. Cuyahoga No. 89912, 2008-Ohio-2039, ¶ 24 ("By blocking her exit and displaying the gun, appellant restrained the victim of her liberty."); *State v. Garrett*, 2d Dist. Greene No. 2008 CA 102, 2009-Ohio-4584, ¶ 17 (concluding that the State presented sufficient evidence that Garrett kidnapped the victim based on the victim's "testimony that Garrett attacked her, inflicted multiple injuries and retrain[ed] her liberty"). Logan also expressly and impliedly threatened Cole and

Shofner—that is, Logan threatened that he would "shoot up" Cole's mother's house, and Shofner was afraid Logan would harm her again if she tried to leave. *See State v. Harwell*, 2d Dist. Montgomery No. 25852, 2015-Ohio-2966, ¶ 85-86 (concluding that the State presented sufficient evidence that Harwell restricted the victims' liberty, in part, based on one of the victim's testimony that "Harwell made threats, which led him to believe that he would be shot or killed if he tried to escape" and that Harwell "told him not to run away" and the other victim's testimony "indicat[ing] that Harwell restrained [his] liberty through threat of harm to" the other victim); *State v. Cruz*, 9th Dist. Medina No. 03CA0031-M, 2003-Ohio-4782, ¶ 17 (concluding that the State presented sufficient evidence that Cruz restricted the victim's liberty because Cruz "threatened to cut off [the victim's] genitals, and had the apparent ability to carry out that threat since she "cut him at least once with the knife"). Further, Logan brandished a gun while Johnson was assaulting Shofner. *See also Harwell* at ¶ 85 (concluding that the State presented sufficient evidence that Harwell restrained the victim's liberty based on the victim's testimony, in part, that the victim "felt threatened when Harwell flashed his gun"); *Dzelajlija* at ¶ 24. Likewise, although Logan permitted Shofner to leave on December 28 to visit her son, he did not permit Cole to leave with her and threatened harm to Cole if Shofner contacted the police. Based on those facts, a rational trier of fact could conclude beyond a reasonable doubt that Logan limited or restrained Cole's and Shofner's

-17-

freedom of movement. Therefore, the State presented sufficient evidence that Logan restrained the liberty of Cole and Shofner.

{¶27} Also, construing the testimony summarized above in a light most favorable to the prosecution, a rational trier of fact could conclude that Logan restrained Cole's and Shofner's liberty with the purpose of holding them in a condition of involuntary servitude. Indeed, the testimony summarized above demonstrates that Logan limited or restrained Cole's and Shofner's freedom of movement for the purpose of performing labor or services against their will—that is, Logan prevented Cole and Shofner from leaving his house to compel Cole and Shofner to perform renovation-related labor and services. *See United States v. Booker*, 655 F.2d 562, 563, 567 (4th Cir.1981) (concluding that there was sufficient evidence of "kidnapping for the purpose of exacting involuntary servitude" under 18 U.S.C. 1853 where the victims were forbidden to leave a migrant camp until they satisfied any debts owed, were threatened with serious injury or death if they attempted to leave without paying their debts, and those threats were "backed up" "with severe beatings and assaults with firearms").

{¶28} Cole renovated Logan's house for nearly 36 hours. Logan compelled Cole to perform a number of tasks, including painting doors and multiple rooms, putting a finished texture on the ceiling, sanding walls, mounting a bathroom sink, working in the basement, and finishing other "little" projects throughout the house.

Although Shofner was initially unconscious from Johnson's attack, and was permitted to leave to visit her son, Shofner was compelled to work by cleaning up after Cole.

{¶29} Cole and Shofner feared retribution from Logan if they did not stay and work at Logan's house. *Compare United States v. Dann*, 652 F.3d 1160, 1169-1170 (9th Cir.2011) (noting that, under federal law, "someone is guilty of forced labor if he intends to cause a person in his employ to believe that if she does not continue to work, she will suffer the type of serious harm * * * that would compel someone in her circumstances to continue working to avoid that harm"). Cole began renovating Logan's house after witnessing Johnson, at Logan's instruction, beat Shofner until she was unconscious. Cole stayed and performed those tasks because he was afraid that Logan would hurt him, hurt Shofner again, or "shoot up" his mother's house. Even though Johnson severely injured Shofner, Shofner tried to work as much as she was able because she was afraid Logan would hurt her again. Shofner did not think she could leave the house without being harmed. She even returned to Logan's house after being permitted to leave to visit her son because of her fear of Logan based on his threats of violence against her, Cole, and Cole's mother. Moreover, Cole and Shofner knew that Logan had a gun after he brandished it while Johnson was assaulting Shofner. *Compare State v. Branson*, N.C.App. No. COA07-1216, 2008 WL 1946866, *2 (May 6, 2008) (concluding that "there was

-19-

sufficient evidence to support the kidnapping for the purpose of involuntary servitude" because Branson compelled the victim to "drive him away from the scene of the accident" at gunpoint).

{¶30} For these reasons, we conclude that a rational juror could conclude that Logan limited or restrained Cole's and Shofner's freedom of movement for the purpose of performing labor or services against their will. *See United States v. Djoumessi*, 538 F.3d 547, 552-553 (6th Cir.2008) ("a rational trier of fact could conclude that [the victim's] labor was involuntary for at least some portion of her stay"). That is, Logan detained Cole and Shofner through fraud, force, and coercion to control Cole and Shofner for a period of nearly 36 hours for the purpose of subjecting them to involuntary servitude. *See Perry v. State*, 853 P.2d 198, 202 (Ok.App.1993) (construing Oklahoma's kidnapping statute to include "an 'involuntary servitude' element" and noting that "[i]nherent in [that] element are any acts or services, or the forbearance of same, done at the command of the perpetrator, through force, inveiglement or coercion, for the benefit of the perpetrator"). Thus, the State presented sufficient evidence that Logan purposefully held Cole and Shofner in a condition of involuntary servitude.

{¶31} Accordingly, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Logan committed kidnapping in violation of R.C. 2905.01(A)(6). As such, Logan's convictions are based on sufficient evidence.

**{¶32}** Logan's first assignment of error is overruled.

**Assignment of Error No. II**

**The trial court erred in failing to advise Evred J. Logan of the possible defenses to the charges and circumstances in mitigation thereof as required by Crim.R. 44(A), thus failing to insure [sic] that Mr. Logan's waiver of counsel was knowingly, intelligently, and voluntarily made. Sixth and Fourteenth Amendments of the United States Constitution, Article I, Section 10 of the Ohio Constitution. (Tr. 9-31 and 33-92).**

**{¶33}** In his second assignment of error, Logan argues that the trial court erred by permitting him to represent himself at trial without ensuring that his decision was knowing, intelligent, and voluntary. In particular, he argues that his decision to represent himself at trial was not knowing, intelligent, and voluntary because the trial court failed to advise him of the possible defenses to the charges and circumstances in mitigation thereof.

**{¶34}** "The Sixth Amendment to the United States Constitution provides that an accused shall have the right 'to have the Assistance of Counsel for his defense.'" *State v. Owens*, 3d Dist. Allen No. 1-07-66, 2008-Ohio-4161, ¶ 9, quoting the Sixth Amendment to the U.S. Constitution. "Although a defendant has a right to counsel, the defendant may 'waive that right when the waiver is voluntary, knowing, and intelligent.'" *Id.*, quoting *State v. Petaway*, 3d Dist. Logan No. 8-05-11, 2006-Ohio-2941, ¶ 8, citing *State v. Gibson*, 45 Ohio St.2d 366 (1976), paragraph one of the syllabus, citing *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525 (1975). ""'"[T]o

establish an effective waiver of right to counsel, the trial court must make sufficient inquiry to determine whether defendant fully understands and intelligently relinquishes that right."'" *Id.*, quoting *Petaway* at ¶ 9, quoting *Gibson* at paragraph two of the syllabus. "In order for the defendant's waiver of counsel to be valid "'such waiver must be made with an apprehension of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter.'"" *Id.* at ¶ 10, quoting *Gibson* at 377, quoting *Von Moltke v. Gillies*, 332 U.S. 708, 68 S.Ct. 316 (1948). *Accord State v. Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, ¶ 40.

{¶35} Furthermore, "Crim.R. 44(A) provides that a criminal defendant charged with a serious offense is entitled to counsel 'unless the defendant, after being fully advised of his right to assigned counsel, knowingly, intelligently, and voluntarily waives his right to counsel.'" *State v. Schleiger*, 141 Ohio St.3d 67, 2014-Ohio-3970, ¶ 20, quoting Crim.R. 44(A). "And Crim.R. 44(C) provides that '[w]aiver of counsel shall be in open court and the advice and waiver shall be recorded as provided in Crim.R. 22. In addition, in serious offense cases the waiver shall be in writing.'" *Id.*, quoting Crim.R. 44(C).

> "[W]hen a criminal defendant elects to proceed pro se, the trial court
> must demonstrate substantial compliance with Crim.R. 44(A) by

making a sufficient inquiry to determine whether the defendant fully understood and intelligently relinquished his or her right to counsel. If substantial compliance is demonstrated, then the failure to file a written waiver is harmless error."

*Id.*, quoting *State v. Martin,* 103 Ohio St.3d 385, 2004-Ohio-5471, ¶ 39.

**{¶36}** We conclude that Logan's waiver of his right to trial counsel was knowing, intelligent, and voluntary—that is, the trial court substantially complied with the requirements of Crim.R. 44(A) because it sufficiently inquired whether Logan fully understood and relinquished his right to counsel and obtained from Logan a written waiver of counsel. *See State v. Koehler*, 3d Dist. Wyandot No. 16-15-10, 2016-Ohio-3384, ¶ 11. When Logan indicated that he wanted to represent himself, the trial court conducted a lengthy colloquy with Logan and his trial counsel, followed by a colloquy in open court. (*See* Mar. 28-30, 2016 Tr., Vol. I, at 4-32).

**{¶37}** Indeed, the trial court cleared the courtroom to discuss, ex parte, Logan's request to represent himself with Logan and Logan's trial counsel. (*Id.* at 6). During the ex parte discussion, Logan and Logan's trial counsel informed the trial court as to their divergence in trial strategy. In particular, Logan's trial counsel stated, Logan

has done a lot of work on his own.  He has a lot of theories.  He has expansive notes on questions he wanted to ask.  I don't know that I would ask them the same way, or even ask them.  So, you know, when someone is facing thirty-six years, with a minimum of six years, I think if convicted of all aspects of the case, it's pretty substantial and they should have confidence or they should be entitled to pursue it their own way should they so choose.

(*Id.* at 8-9).

**{¶38}** The trial court explained to Logan the State's burden of proof, the potential prison sentence Logan was facing if convicted, and his right to counsel. (*Id.* at 10-11).  Further, the trial court conducted a lengthy discussion with Logan regarding the disadvantages of representing himself and told Logan that "[l]awyers know the[] rules" that are to be followed at trial because "[t]hey went to law school to learn the rules, and how to conduct trials, and how to ask questions, and what they can say and what they can't say."  (*Id.* at 10-11, 19-20).  The trial court also offered numerous scenarios involving defendants representing themselves at trial, discussed with Logan and his trial counsel the role of a "shadow counsel" at trial, and responded to all of Logan's questions.  (*Id.* at 11-19, 22).  The trial court inquired whether Logan understood: (1) the penalty he was facing; (2) that he would be required to follow the same rules as a trained lawyer; and (3) what the case was

about. (*Id.* at 19-20). At the trial court's inquiry, Logan stated that he wanted to represent himself and wanted his trial counsel to be appointed as "shadow counsel" for trial. (*Id.* at 19, 21).

{¶39} After the trial court was satisfied with its ex parte inquiry of Logan, the trial court in open court inquired whether Logan wished to represent himself at trial. (*Id.* at 23). Again, the trial court inquired whether Logan understood that: (1) he has the right to an attorney; (2) he would be held to the same rules of evidence and criminal procedure that bind any attorney; (3) he can subpoena witnesses; and (4) he can change his mind at any time during trial and resume being represented by counsel (*Id.* at 25-32). Further, during the colloquy in open court, Logan informed the trial court that he represented himself in a resisting-arrest case heard in municipal court the previous November. (*Id.* at 24-25). Finally, Logan informed the trial court that he was voluntarily waiving his right to be represented by counsel at trial. (*Id.* at 31-32). Thereafter, the trial court accepted his waiver of counsel, and Logan signed a written waiver of his right to trial counsel. (*Id.* at 32). (*See* Doc. No. 62). During the State's direct examination of its first witness, Logan informed the trial court that he no longer wanted to represent himself and wanted to be represented by counsel. (Mar. 28-30, 2016 Tr., Vol. I, at 92). The trial court accepted Logan's request and reappointed Logan's trial counsel. (*Id.* at 93).

{¶40} Based on our review of the record, we conclude that the trial court substantially complied with the requirements of Crim.R. 44(A). The trial court devoted nearly 29 pages of trial transcript to ascertaining whether Logan knowingly, intelligently, and voluntarily waived his right to counsel. Although the trial court did not explicitly state that these are "the possible defenses to the charges and circumstances in mitigation thereof" in ascertaining whether Logan's waiver of counsel was knowing, intelligent, and voluntary, that does not mean Logan's waiver was not valid. Rather, the record reflects that Logan did "a lot of work on his own" regarding the case, developed "a lot of theories," and drafted "expansive notes on questions he wanted to ask." (Mar. 28-30, 2016 Tr., Vol. I. at 8-9). Likewise, Logan asked intelligent questions of the trial court regarding representing himself during the ex parte hearing and informed the trial court that he had previous experience representing himself in a criminal case. *Compare Owens*, 2008-Ohio-4161, at ¶ 15 (concluding that Owens' decision to waive his right to counsel was intelligent, knowing, and voluntary because, in part, "Owens had previously represented himself in this case and was aware of the consequences of waiving his right to counsel"). Based on those facts, we conclude that Logan represented to the trial court that he understood the possible defenses to the charges against him and any circumstances in mitigation of those charges.

**{¶41}** Therefore, Logan knowingly, intelligently, and voluntarily waived his right to counsel. *See id.* at ¶ 19; *State v. Crider*, 3d Dist. Allen No. 1-13-20, 2014-Ohio-2240, ¶ 10.

**{¶42}** Logan's second assignment of error is overruled.

**{¶43}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI and ZIMMERMAN, J.J., concur.**

**/jlr**