[Cite as *State v. Friess*, 2023-Ohio-3409.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                      Court of Appeals No.  L-22-1121

        Appellee                               Trial Court No.  CR0202001215

v.

Brian P. Friess                                   **DECISION AND JUDGMENT**

        Appellant                              Decided:  September 22, 2023

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Lauren Carpenter, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Brian Friess, appeals the April 14, 2022 judgment of the Lucas County Court of Common Pleas sentencing him following his conviction of aggravated murder, aggravated robbery, kidnapping, and arson.  For the following reasons, we affirm.

## I. Background and Facts

{¶ 2} In January 2020, the state charged Friess with crimes related to the November 2019 murder of M.K. The indictment alleged one count each of aggravated murder in violation of R.C. 2903.01(B), an unclassified felony; aggravated robbery in violation of R.C. 2911.01(A)(1), a first-degree felony; kidnapping in violation of R.C. 2905.01(A)(2), a first-degree felony; and arson in violation of R.C. 2909.03(A)(1) and (D)(2)(b), a fourth-degree felony.[1] The aggravated murder, aggravated robbery, and kidnapping charges each included firearm and repeat violent offender specifications. The state also charged Chad Friess, Friess's brother, and James Haefner, Friess and Chad's half-brother, with crimes related to the murder.

{¶ 3} Friess's case was tried to a jury in March 2022. The state presented the testimony of Christine Keagler and John Keagler, M.K.'s parents; officer Kayla Lehmann of the Oregon Police Department ("OPD"); officers Joe Villanueva and Jamie Brown of the Toledo Police Department ("TPD"); Angela DeWitt, an investigator for the Toledo Fire Department ("TFD"); Tonia Morris, a friend of Friess's family; Mollie Jordan, a criminalist at the State Fire Marshal's forensic laboratory; detectives Roy Kennedy and Paul Marchyok of TPD; Dr. Jeffrey Hudson, a deputy coroner in the Lucas County Coroner's office; Julie Altizer, a forensic scientist with the Ohio Bureau of Criminal

---

[1] The indictment also charged Friess with one count of tampering with evidence in violation of R.C. 2921.12(A)(1), a third-degree felony, but this charge was not presented to the jury, and, at the state's request, the trial court dismissed it at sentencing.

2.

Investigation ("BCI"); Kristen Radford, Friess's former romantic partner; agent George Rienerth II of the FBI; Jake Magrum, a jail acquaintance of Friess; and several other law enforcement officers. Friess did not present any witnesses. The following facts were adduced at trial.

**A. Disappearance and preliminary investigation**

{¶ 4} M.K. lived with her parents. On November 8, 2019, the night she was murdered, she left home around 8:30 p.m. to collect money that someone owed her. She told her mother that she would not be out too long. Her parents did not know who owed her money or who she was going to meet. Christine began to worry around 10:00 p.m. because she texted M.K. about one of M.K.'s children, and M.K. did not respond, which was unusual. Around midnight, Christine used their shared cellphone plan to look up the phone numbers of the last three people M.K. had contacted so that she could contact them about M.K.

{¶ 5} Christine testified about a text conversation that she had with someone whose phone number was later identified as Friess's. In the messages, most of which were sent between 5:30 a.m. and 10:00 a.m. on November 9, the person who Christine was messaging told her that his name was Brian, he was supposed to meet M.K. at Lido Lanes at 9:00, and when he arrived at the bowling alley, although M.K. texted him that she was there, the parking lot was empty. Friess also advised Christine to check to see if M.K. had been in a car accident and to "call someone" and file a report. The last two

3.

messages indicate that Brian talked to the police sometime after the Keaglers reported M.K. missing.

{¶ 6} When M.K. did not come home, the Keaglers called OPD the morning of November 9 to report her missing. Lehmann took the report. The Keaglers told Lehmann when they last saw M.K., the information that Christine had learned from texting "Brian," who M.K. last contacted on her cellphone, and information about an ex-boyfriend who had threatened M.K. Lehmann called the Brian who texted with Christine and identified him as Friess. During the call, Friess told Lehmann that he had contacted M.K. to repay money that he borrowed; they agreed to meet at Lido Lanes; M.K. texted that she was at the bowling alley; when he got there five to ten minutes later, Friess did not see her and texted her to flash her headlights, but M.K. did not respond; he left the parking lot when he did not hear back from M.K.; and Friess later texted M.K. to find out if the texts from Christine were a joke and if M.K. was okay, but he did not get any responses.

{¶ 7} After reporting M.K. missing, John decided to drive around to see if he could find her or her car. He started at Lido Lanes because that was where Brian said he was supposed to meet her the night before. When he arrived at the bowling alley, located on South Avenue in south Toledo, there were police in the parking lot. Villanueva and his partner were at Lido Lanes for an unrelated investigation when John arrived around 1:30 p.m. John approached them to ask for help locating M.K. He gave descriptions of her and her car. John's description of M.K., including his description of her tattoos, led

4.

Villanueva to believe that M.K. could be related to a homicide investigation started earlier in the day. After contacting Marchyok, Villanueva and his partner had John follow them to the police station to speak to Marchyok. Detectives used the information from M.K.'s parents to identify her as the victim in this case.

**B. The body**

{¶ 8} Earlier on November 9, a semi driver saw M.K.'s body while driving on Interstate 75 and reported it to TPD. When officers—including Brown, Kennedy, and Marchyok—arrived, they found a female body lying face down at the bottom of an embankment beside the road in the area of South Avenue and Kuhlman Drive. Brown, who was one of the first officers on the scene, thought that the body had been there for a while and that the blood on M.K.'s back did not look fresh. Based on the appearance of the blood on the body, Kennedy thought that the victim had been dead for "some hours before [his] arrival * * *." Marchyok, the lead investigator on this case, believed that M.K.'s body had been moved, but he did not see any evidence of dragging. He believed that the murder happened where M.K. was found. None of the officers on the scene saw evidence of any weapons, footprints, drag marks, or tire tracks. TFD pronounced the death shortly after 8:00 a.m.

{¶ 9} Hudson conducted the autopsy on M.K. During his testimony, Hudson noted that (1) there was a "significant" amount of blood on the back of M.K.'s jacket; (2) the back of M.K.'s shirt was more saturated with blood than that front; (3) the stab wounds on the front side of her body were "pale" and "more yellow than red," which

5.

indicated that there was less bleeding from those injuries; (4) the wounds on M.K.'s back side were "more red" than the wounds on the front; (5) based on the location of the blood (i.e., much more on M.K.'s back side than her front side), he believed that the stab wounds on the back occurred before the ones on the front; (6) he believed that the paler wounds on the front occurred "perimortem," or when M.K. was near death; and (7) the shape of the wounds led him to conclude that the injuries were caused by a "single edge knife blade" that was not serrated and did not have a hilt or wrist guard.

{¶ 10} Hudson believed that the first wound was a stab to M.K.'s back that punctured her lung and the back side of the right atrium of her heart. This wound was fatal. He said that death from bleeding caused by a cut to the right atrium would happen "within a matter of minutes * * *." A knife that was able to cause such an injury "would be a little on the long side * * *." Along with the injury to the right atrium, there were several other wounds that Hudson would consider "fatal." Hudson's report indicated that M.K. was stabbed a total of 24 times and had five other cuts on her body, including defensive wounds on her hands. Hudson determined that M.K.'s cause of death was multiple stab wounds, and her manner of death was homicide.

{¶ 11} Although M.K. was pronounced dead at 8:05 a.m. on November 9, Hudson said that was not the time she actually died. Rigor mortis had set in by the time M.K.'s body was found, which indicated that she had died "several hours before that." Hudson agreed with the prosecutor that M.K. "[a]bsolutely" could have died between 9:00 and 10:00 p.m. the night before.

6.

{¶ 12} On cross, Hudson agreed with counsel that M.K.'s time of death could have been any time from 9:00 p.m. on November 8 to 1:00 a.m. on November 9. He also said that a person with defensive wounds could have injured their attacker and that the type of wounds M.K. had could have caused substantial bleeding that might have transferred blood to the attacker. Hudson could not tell from the wounds whether the attacker was right-handed or left-handed.

### C. Murder investigation

{¶ 13} After identifying M.K., Marchyok asked M.K.'s parents questions about her whereabouts the night before. He learned that she left home around 8:30 and was supposed to meet someone who owed her money relatively close to where her body was found. He knew Friess's full name from OPD, and knew that Friess was the last person to have contact with M.K. The Keaglers also told detectives that M.K.'s ex-boyfriend had threatened her a month earlier.

{¶ 14} Christine explained that she thought the ex-boyfriend might have been involved in M.K.'s disappearance because the couple broke up several months before M.K.'s murder and M.K. got a protection order against him about a month before her murder. Christine said that M.K. got the protection order because the ex-boyfriend came to her workplace and threatened her. John thought that the ex-boyfriend sent M.K. threatening text messages—including a threat to kill her—but did not know of the ex-boyfriend being physically violent with M.K. As far as Christine knew, M.K. did not have any problems with the ex-boyfriend after she got the protection order.

7.

{¶ 15} Additionally, once M.K.'s name was released, TPD received "[s]everal" tips and a statement from a jail inmate about the ex-boyfriend. Marchyok learned that the ex-boyfriend had threatened to kill M.K. and himself, and confirmed that M.K. had a protection order against him. Marchyok asked the ex-boyfriend's neighbors for his whereabouts, which led to finding out that the ex-boyfriend was in the psychiatric unit of a local hospital. Detectives originally thought that the ex-boyfriend was hospitalized on November 8 based on information from the ex-boyfriend's neighbor, but later learned that the neighbor lied and the ex-boyfriend was admitted on November 10. He was hospitalized because of "police involvement" due to "assaultive behavior" with his current girlfriend.

{¶ 16} Although he was hospitalized, the ex-boyfriend agreed to speak with detectives. The ex-boyfriend voluntarily told them where he was, what he was doing, and who he was with around the time of the murder, gave them his phone and password so they could inspect it, and provided a DNA sample.

{¶ 17} For part of the night of November 8, the ex-boyfriend claimed that he was using a business's Wi-Fi network on his phone, but, although Marchyok had the ex-boyfriend's phone, he did not attempt to use data from the phone to verify the ex-boyfriend's claim. Instead, he relied on statements from someone who lived across the street from the business, who told detectives that the ex-boyfriend was at his house shortly before 8:00 p.m. The neighbor could not verify the ex-boyfriend's whereabouts after 8:00 p.m., however.

8.

{¶ 18} Kennedy said that the ex-boyfriend "seemed to be pretty taken aback by * * *" and "had an emotional response to * * *" the news of M.K.'s murder. Based on detectives' contact with people who the ex-boyfriend said could corroborate his whereabouts, hospital records, and "other information that was obviously leading us in other directions[,]" Kennedy believed that the ex-boyfriend "was pretty much a dead end as far as his involvement * * *" in the murder. Kennedy also noted that the ex-boyfriend lived in north Toledo and did not have a vehicle. Marchyok agreed that "all the information for him came back that he did not have the ability to be anywhere where [M.K.] was."

{¶ 19} Regarding the investigation of Friess, detectives went to his apartment after talking to the Keaglers on November 9. Friess was not home, but Morris, who was dog-sitting for Friess, told the detectives that Friess left that morning for a trip to Cleveland and was home the night before, which was not true. Kennedy said that he "didn't believe" Morris's story, but he "didn't know for sure" whether she was telling the truth. Marchyok said that he eventually decided that Morris was lying because her story that Friess was home all night ended up conflicting with information that Friess later provided to Kennedy about going to Chad's house and meeting up with M.K. Kennedy left his card and asked Morris to let Friess know that the detectives wanted to speak to him. When Morris spoke to Friess later in the afternoon, she told him about the detectives' visit.

9.

{¶ 20} Morris testified that Friess did not tell her to lie about his whereabouts at the time she spoke to the detectives. She claimed that she lied to the police because she was scared and panicked when she opened the door and "saw a whole bunch of officers." After he returned from Cleveland, Friess went to Morris's house, and, according to Morris, Friess told her that "I don't remember anything, and that he was home Friday night."

{¶ 21} Almost two years later, TPD detectives spoke with Morris regarding an unrelated investigation. During that interview, Marchyok confronted Morris about lying to them regarding Friess. She admitted to lying about Friess's whereabouts on the evening of November 8, 2019. At trial, Morris said that Friess left the apartment around 5:30 p.m. He was wearing blue shoes, blue jeans, a black t-shirt, and a flannel coat. On cross, Morris confirmed that Friess's coat was not a "bulky coat" or a "down coat[.]" He returned "close to midnight" wearing tennis shoes, gray sweatpants, and a gray or black hoodie. Morris said that she was sleeping before Friess came home, but the dogs' barking woke her up when he returned. She also admitted on cross that she had gotten out of the hospital earlier that day and was taking prescription painkillers.

{¶ 22} Later on November 9, Friess called Kennedy. The version of events from November 8 that Friess gave was consistent with the version that he gave Christine and Lehmann. He thought that M.K. not showing up at Lido Lanes was her way of "getting back at" him for an "incident" a couple of weeks before when M.K. got mad at him because he was not at the location where she was supposed to pick him up. When he did

10.

not hear from M.K. after asking her to flash her headlights, he waited a few minutes and then left the parking lot. An hour or so later, Friess texted her something about her not talking to him.

{¶ 23} Friess said he was at Chad's house until around 11:00 or 11:30 p.m. on November 8, and went straight back to his apartment after he left. He was wearing gray sweatpants, a gray shirt, and a red flannel coat. He drove a dark blue Ford Explorer, but did not drive it to Lido Lanes that night.

{¶ 24} After Kennedy's phone call with Friess, the detectives went to Chad's house and spoke to him and his girlfriend. They learned that Friess and several others, including Chad and Haefner, were at Friess's house the night before.

{¶ 25} Marchyok also collected any security video that he could find from around the area where M.K. was found, the route she likely took to Lido Lanes, around Chad's house, and near the ATM. Ultimately, the state presented video from a house across the street from Chad's, an ATM that M.K. withdrew money from November 8, and a gas station across from the ATM.

{¶ 26} The video that captured Chad's house showed a small portion of his front porch and driveway; it did not show any of the house's doors. Figures are seen coming and going at several different times that evening, but the video quality is insufficient to show who, exactly, enters and leaves the house, whether the figures are, in fact, going into or out of the house, or any real details of the figures. The gas station video (which did not include a timestamp) showed M.K.'s car turning into the bank's parking lot from

11.

South Avenue and pulling into the ATM lane. Several minutes later, the video shows M.K.'s car leaving the bank and turning back on to South Avenue in the direction it was traveling when it entered the parking lot. The ATM video showed M.K. using the machine, and that she made withdrawals totaling $300. The video also shows a passenger with a gun pointed at M.K., and M.K. is seen handing the passenger the money that she withdrew.

{¶ 27} Marchyok said that he ruled Chad out as a suspect in the robbery after seeing the ATM video. Chad has tattoos on his hands, but the passenger in M.K.'s car did not have hand tattoos. Marchyok acknowledged that the people who saw Friess at Chad's on November 8 provided consistent descriptions of Friess's clothes, and none said that he was wearing a "bulky coat," which is how Marchyok described the passenger's attire in his report.

{¶ 28} Ten days after the murder, officers executed search warrants at Friess's apartment and Chad's house. The officers collected items from Friess's apartment to be tested for the presence of blood; most of the items tested negative. At Chad's house, officers found a gun and two loaded magazines under the tarp covering a boat sitting in the driveway. Marchyok said that the size and shape of the gun was consistent with the gun in the ATM video.

{¶ 29} The day that police executed the search warrants, Marchyok had Friess, Chad, and their girlfriends come to the police station for interviews. Detectives got

12.

conflicting information about who was at Chad's house on November 8, who left, why they left, how long they were gone, and when they came and went.

{¶ 30} In his interview, Friess said that he initially befriended M.K. with the intent of "hustling" her out of money. However, due to recent events in M.K.'s life, Friess "felt bad for her" and decided to pay back some of the money she had given him. He arranged a meeting with M.K. on November 8 to return the money.

{¶ 31} He arrived at Chad's house around 8:30 that night, and M.K. texted him that she was at Lido Lanes around 9:00. Friess walked over to the bowling alley, but did not see M.K.'s car. He texted her to flash her headlights, but still did not see anyone, so he waited for a couple of minutes before walking back to Chad's house. He said that he was gone from Chad's for approximately 10 minutes, and, although he was in the yard throughout the night, he did not leave Chad's again until he went home between 11:30 p.m. and midnight. He was home and asleep by the time Christine first messaged him.

{¶ 32} Kennedy and Marchyok both agreed that Friess provided consistent information to OPD, Kennedy on the phone, and the detectives during his interview.

{¶ 33} After the interviews, there were "a lot of small things" bothering Marchyok about the case. For example, Marchyok thought that M.K.'s body was moved because the bloodstain on the ground by her body matched the stain on the back of her shirt, but she was found face down, and everyone who encountered the body before and during the processing of the scene denied moving her.

13.

{¶ 34} Marchyok also noticed that M.K.'s and Friess's "phones did move together, you know, at the same times. The tower movements moved together." He found "the movement of the phones" odd:

a few things really bothered me that [sic] Brian's phone stayed hitting off the tower of the area of where the body would be and [M.K.'s] phone after being there left, went back in the area of Chad's house, and then Chad's phone, [Haefner's] phone and [M.K.'s] phone then move back toward the area of the body, and why would anybody go back over to that area. And, you know, then [M.K.] and Brian's phone and everything end up where the car gets burned up at.

{¶ 35} Additionally, the phone records showed that M.K. had responded to Friess's last text message to her, which contradicted the story he told Kennedy when they spoke on November 9. Kennedy said that M.K.'s phone and Friess's phone "were in the same vicinity at the time when [detectives] suspected she would have been killed."

{¶ 36} Although Marchyok could not definitively say that M.K.'s phone was moving without her most of the night, he knew that her last outgoing call or text was at 9:07 p.m. when she responded to Friess's request that she flash her headlights; based on M.K.'s "history of her phone use * * *[,]" Marchyok thought that "if she was still able to, she would have responded to other texts and calls that she was receiving * * *."

14.

## D. Arson investigation

{¶ 37} Around 11:00 p.m. on November 8, TPD responded to a report of a burning car in an alley off Prouty Avenue. It was later identified as M.K.'s car. According to one of the reports in the TPD file, a neighbor reported hearing voices in the alley before hearing a loud boom around 10:00 p.m., seeing a car on fire, and calling 911. The time that the witness reported hearing the boom—around 10:00—corresponded with cellphone data showing Friess's phone using tower 1 in the area of Chad's house and Lido Lanes.[2] Marchyok assumed that a "more accurate time" for the fire was when the witness called 911—at 10:47 p.m.

{¶ 38} Several days after the fire, DeWitt went to the TPD impound lot to inspect the car. She was called to photograph the car after the fact—not called the night of the fire to investigate—because the firefighters on the scene determined that it was arson. She agreed with that determination.

{¶ 39} Based on the extent and pattern of the damage to the rear and interior of the car, DeWitt determined that the fire started inside the rear of the car. Although DeWitt did not see evidence of any accelerants in the car, she took samples from the cargo compartment and the backseat to send for further testing to determine if the arsonist used

---

[2] For clarity, we are naming the two cellphone towers primarily involved in this case. Tower 1 is located near Lido Lanes, Chad's house, the ATM, and where M.K.'s car was burned on Prouty Avenue. Tower 2 is located near the area where M.K.'s body was found.

15.

an accelerant. She also testified that she did not see evidence of any burnt clothing in the backseat, but that "[e]verything was fairly well burned out."

{¶ 40} Jordan analyzed the fire debris that DeWitt collected. She determined that both samples—one from the car's backseat and one from its cargo compartment—were positive for gasoline.

### E. DNA evidence

{¶ 41} Altizer analyzed the DNA results for multiple pieces of evidence in this case. She explained that she can reach several different conclusions when she compares DNA standards from specific individuals to the DNA found on tested items. "Included" means that the known person's DNA is "potentially on that item." Altizer also provides a statistic with an included result that shows "how common or rare the profile is." "Excluded" means that the known person's DNA is not on the tested item. And "not a major contributor" means that the item contains a mixture of DNA from multiple individuals and some of the DNA on the item is "low level DNA" that Altizer is not able to compare to the known individuals. In other words, "not a major contributor" does not mean that a person's DNA is or is not on the item; it simply means that Altizer cannot interpret any DNA other than the DNA that is most prevalent on the item, i.e., the DNA of the item's major contributor or contributors.

{¶ 42} On cross, Altizer clarified that she is required to list each person whose standard she is comparing to tested items as "not a major contributor" when an item contains a mixture with low-level, uninterpretable DNA. So, because the police asked

16.

her to compare standards from Friess, M.K., Chad, and the ex-boyfriend to the evidence in this case, she had to reach a conclusion regarding each person for each tested piece of evidence. In other words, she said, "Any time I came up with an unknown profile, I needed to compare it to standards in the case, and each name I compared to had to be listed for each result." As an example, counsel asked Altizer about the results for the swab from the stain and paper towel related to the left-hand nail clippings. That swab included a mixture of DNA. Altizer compared standards from Friess, M.K., Chad, and the ex-boyfriend to the profile for the major contributor and found that M.K. was the only major contributor. Thus, Friess, Chad, and the ex-boyfriend were each reported as "not a major contributor." After the major contributor's profile was considered, the remaining DNA was low-level DNA that was not suitable for comparison to any of the standards. Altizer "did not interpret [the low-level DNA] and [] did not compare to it." When defense counsel asked if it was fair to say that the low-level DNA is not DNA from someone who provided a standard, Altizer said, "It could be, it could not be. I could not do any sort of comparison to the low level."

{¶ 43} Of the items tested, Friess was excluded as a contributor for several items—including M.K.'s right-hand fingernail clippings and all swabs from her body—and was not a major contributor to any of the remaining items—including a stain on some left-hand fingernail clippings and debris on the paper towel packaged with those clippings (which were listed as the same swab), M.K.'s clothing, and the gun police

17.

found at Chad's house. The only swabs that listed Friess as a contributor came from his cellphone and cellphone case.

{¶ 44} In addition to finding DNA on some of the items, the BCI lab also determined that M.K.'s clothes, M.K.'s body, the paper towel packaged with the right-hand fingernail clippings, the swab from the left-hand fingernail clippings, and Friess's cellphone case were presumptively positive for blood. The lab noted that M.K.'s jacket and pants were "negative for acid phosphatase activity," which, according to Altizer, meant "there was no reason to believe that there was semen present" on those items.

{¶ 45} Regarding some of the specific items that BCI tested, Altizer testified that the low-level DNA on M.K.'s jacket and pants contained "evidence of male DNA specifically[,]" but she "couldn't make any comparison" to the low-level DNA. Of the seven swabs from Friess's cellphone and cellphone case, two did not contain any DNA. Of the remaining five swabs, Friess was a major contributor to all five, and M.K., Chad, and the ex-boyfriend were not major contributors to any. Additionally, four of the swabs contained a profile from an unknown individual who was not Friess, M.K., Chad, or the ex-boyfriend. Finally, of the five swabs from the gun found at Chad's house, two did not contain sufficient DNA to make a comparison; one included Chad and excluded Friess, M.K., and the ex-boyfriend; and two listed Chad as a major contributor. M.K. was also a major contributor to the DNA mixture found on the gun's trigger. The lab did not find any blood on the gun.

18.

{¶ 46} Three of the items that BCI tested were a letter and envelopes addressed to Radford, Friess's former romantic partner. One of the envelopes had the name "Jonny Walker" in the return address and the other had the name "Boogy-Man" in the return address. The letter and one of the envelopes did not have sufficient DNA for Altizer to make a comparison, but the other envelope contained a DNA profile consistent with Friess. However, Altizer did not know which swab came from which envelope, so she could not say whether the "Jonny Walker" or the "Boogy-Man" envelope was the one that contained Friess's DNA. Friess objected to the admission of the letter and envelopes because Altizer could not identify which envelope contained Friess's DNA, but the court overruled the objection.

{¶ 47} During his cross-examination of Marchyok, Friess asked about Marchyok's investigation regarding another person at Chad's house the night of the murder ("the friend"). Marchyok said that they did not have phone data from the friend because he told the detectives that he lost his phone. Marchyok looked into getting information from the friend's cellular provider, but nothing came of it. And, although Marchyok thought that they had collected the friend's DNA, he did not have "any evidence of [the friend] moving in the direction of [M.K.'s] body, * * *" so he did not include the friend's DNA in the limited number of items he was allowed to send to BCI for testing. When he learned that Friess's phone had unknown DNA on it, he did not submit additional DNA samples for comparison because police did not seize Friess's phone until ten days after

19.

the murder and "[a]nybody could have left their DNA within those ten days and would be totally un-relevant [sic] to the investigation."

### F. Cellphone records

{¶ 48} Rienerth is a special agent in the FBI's cellular analysis survey team. He explained that cellphones are always communicating with cell towers while they are on, and cellular providers keep records that "capture your phone's interaction with the network * * *." He is trained to take records from cellular providers and "map[] the information in those records." The information communicated between a phone and a tower can show approximately how far the phone is from the tower and which side, or sector, of the tower the phone communicated with. The tower a phone connects with depends on which tower provides the best signal, so a phone does not always connect to the tower that is geographically closest.

{¶ 49} Rienerth can plot a phone's approximate location relative to a tower using Real Time Tool, or RTT, data. RTT data measures approximately how far the phone is from the tower it communicated with, and Rienerth uses that measurement to plot an arc representing where the phone might have been when it generated the measurement. Generally, the phone would "not be located outside the farthest edge of [an] arc, but [it] can be closer" to the tower, i.e., anywhere within the wedge-shaped area starting at the center of the tower and ending at the distance in the RTT data. However, interference could delay the signal and provide "a little bit longer distance." As an example, in state's exhibit No. 99, the RTT measurement is .73 miles from tower 2. Rienerth used that

20.

distance to plot an arc on the map in which every point is .73 miles from the tower and sector that the phone communicated with; the resulting wedge begins at the center of the tower and covers approximately 120 degrees of a circle.

{¶ 50} Providers generally do not keep RTT measurements for very long; for example, Verizon only maintains RTT measurements for seven or eight days. Without the RTT measurements, Rienerth can conclude that a phone used a certain tower and sector, but cannot provide the approximate distance that the phone was from the tower. Although Rienerth could provide an approximate geographic location of a phone based on RTT data, he was very clear that he could not pinpoint exactly where the phone was when it communicated with the tower. He reiterated this point frequently in his testimony.

{¶ 51} Marchyok asked Rienerth to analyze cellphone records in M.K.'s case. Based on the information that he analyzed, Rienerth created a timeline for each phone on the evening of November 8 and early morning of November 9. Because the measurements that Rienerth maps only provide approximate locations, he could not say that M.K.'s and Friess's phones were in the exact same spot during any of the timeframes he discussed, despite the similar RTT measurements.

{¶ 52} From 8:48 p.m. to 8:54 p.m., the RTT measurements for M.K.'s phone were consistent with movement away from M.K.'s house and toward the area where Lido Lanes was located.

21.

{¶ 53} From 9:03 p.m. to 9:11 p.m., M.K.'s and Friess's phones were both approximately the same distance away from tower 1 (the tower geographically closer to Lido Lanes, Chad's house, the ATM, and the alley on Prouty Avenue) and used the same sectors, indicating to Rienerth that the phones were in a similar geographic area, but he reiterated that he "cannot provide the exact location, just the geographic area consistent with those [RTT] measurements." Lido Lanes and Chad's house are located within the geographic area that Rienerth ascribed to M.K.'s and Friess's phones during that time. For context, Villanueva, a TPD officer who had worked in south Toledo most of his career, testified that Lido Lanes was about two blocks from Chad's house, about four blocks from the ATM, and about six blocks from Prouty Avenue, where M.K.'s car was found. Tower 1 had a different antenna setup, so the areas where the phones might have been was a circle, not an arc. The phones could have been anywhere in the geographic area covered by the circle.

{¶ 54} From 9:11 p.m. to 9:19 p.m., M.K.'s and Friess's phones both moved closer to tower 1 and reported approximately the same RTT distances using the same sectors. During this period, the RTT measurements were the same for both phones, so Rienerth concluded that the phones were in a similar geographic area. This geographic area included the ATM where M.K. withdrew money at gunpoint, but did not include Lido Lanes or Chad's house.

{¶ 55} From 9:21 p.m. to 9:32 p.m., M.K.'s and Friess's phones each used tower 2 (the tower geographically closer to the location where the body was found). M.K.'s

22.

phone used three sectors; Friess's phone used two, which were the same as two of M.K.'s. M.K.'s phone provided RTT measurements that were consistent with the geographic area where her body was found. During that same period, Friess's phone provided only one RTT distance, which was consistent with the geographic area where M.K.'s body was found. Taken together, Rienerth said that the records were consistent with both phones being in the geographic area of the body location during this timeframe.

{¶ 56} From 9:33 p.m. to 9:52 p.m., Friess's phone continued communicating with tower 2. The RTT measurements included a geographic area consistent with the area where M.K.'s body was found.

{¶ 57} During the same timeframe, M.K.'s phone was in two different geographic locations. First, from 9:36 p.m. to 9:44 p.m., M.K.'s phone used tower 1 at distances consistent with the geographic area that included Lido Lanes and Chad's house, and was near the ATM. Second, from 9:47 p.m. to 9:51 p.m., M.K.'s phone used tower 2 at distances consistent with the geographic area where her body was found. When M.K.'s phone used tower 2, three of the four sectors it used were the same as the three sectors Friess's phone used.

{¶ 58} From 9:56 p.m. to 10:08 p.m., M.K.'s and Friess's phones were back to using identical sectors on tower 1, which provided RTT measurements consistent with the geographic area that included Lido Lanes and Chad's house. Rienerth said that the measurements showed that M.K.'s and Friess's phones were in a similar geographic area during this time.

23.

{¶ 59} To determine where the phones were from 10:11 p.m. to 10:30 p.m., Rienerth looked at data from several cell towers that the phones used to find geographic locations where the RTT arcs intersected. Based on that information, he testified that "some of [the] arcs" indicating Friess's phone's possible location intersected over the geographic area where M.K.'s burned car was found. During the same timeframe, M.K.'s phone used several of the same towers and also had several RTT arcs that intersected over the geographic area where her car was found. Rienerth concluded that "both phones have records consistent with being in the geographic area of the vehicle burn location around [10:11 to 10:30 p.m.]"

{¶ 60} The final time period for which Rienerth had any data for M.K.'s phone was 10:21 p.m. on November 8 to 6:07 a.m. on November 9. The RTT measurements were consistent with M.K.'s phone being in the area of Chad's house and Lido Lanes. Rienerth's map of locations for this period shows that Chad's house and Lido Lanes were at the far edges of the RTT arc.

{¶ 61} Regarding Friess's phone later in the evening, from 10:36 p.m. to 10:45 p.m., the phone returned to using tower 1 at distances consistent with the geographic area of Chad's house and Lido Lanes.

{¶ 62} Rienerth also analyzed data from Chad's and Haefner's phones for the period of 9:20 p.m. to 10:30 p.m. on November 8. The RTT data was not available for Chad's phone, so Rienerth could only conclude that the phone used "two towers that provide coverage in the general geographic area around those points depicted on the

24.

map"—i.e., the areas around Chad's house, Lido Lanes, the ATM, the body's location, and the burnt car's location. Because Rienerth did not have distance measurements from RTT data, the potential geographic location of Chad's phone was a much larger area. On cross, Rienerth acknowledged that each of the two towers Chad's phone used could have provided coverage for the "general geographic area" of all of the locations pinpointed on the map (i.e., Chad's house, Lido Lanes, the ATM, the body location, and the burnt car location). He also admitted that a phone can "be in one spot and use two towers." But, based on Chad's phone using the two towers, Rienerth "could not conclude any movement * * *" of the phone.

{¶ 63} During the timeframe Rienerth analyzed, Chad's phone had voice contact with Friess's phone twice, at 9:50 and 9:51 p.m., but Rienerth could not determine from the information on his map which phone initiated the contact. At the time of the voice contact, Chad's phone was using the tower that was geographically closer to the body's location than to his house, Lido Lanes, the ATM, and the burnt car's location.

{¶ 64} Finally, Rienerth did not have access to RTT data for Haefner's phone, either, so he could not provide the phone's distance from any of the towers that it used. In fact, because Haefner's phone showed a lot of voice and SMS (i.e., text message) data from 9:20 to 10:30 p.m., Rienerth could only say that phone was located "in the general geographic greater area of th[e] entire map." Specifically, from 9:50 to 10:00 p.m., Haefner's phone showed voice and SMS activity on sectors of two towers that "provide[d] coverage in the general geographic area around the body location * * *." He

25.

also said that the phone's use of "multiple sectors pointing opposite directions * * *" was consistent with the phone moving around during that period, and was not "consistent with the phone being in a certain spot" during that time.

## G. Marchyok's timeline

{¶ 65} Using the videos and phone records, Marchyok created a timeline for the evening of November 8. At 9:03 p.m., M.K. texted Friess that she had arrived at Lido Lanes. He responded "Ok…I'm walking there" at 9:07 p.m. At 9:06 p.m., just a few seconds before Friess texted that he was on his way, a figure is seen walking in front of Chad's house toward South Avenue, the street where Lido Lanes was located. Marchyok's determination that M.K. was at Lido Lanes was supported by the cellphone location data showing that M.K.'s phone used tower 1, which covered the geographic area around Lido Lanes and Chad's house. Marchyok also concluded that Friess was at Lido Lanes based on the phone data showing that Friess's phone used tower 1, and Friess saying in his interview and a text message to M.K. that he was there. Friess told the detectives that he returned to Chad's house within 10 minutes of leaving for Lido Lanes, but the video did not show anyone walking in front of the house until 9:39 p.m.

{¶ 66} The cellphone data showed that M.K.'s and Friess's phones were using tower 1 in the geographic area that included the ATM (but not Lido Lanes or Chad's house) from 9:11 to 9:19 p.m. The ATM video clearly showed M.K. using the machine from 9:12 to 9:18 p.m. The video shows M.K. with a cellphone in her hand between 9:14 and 9:15 p.m., which corroborated the RTT data placing M.K. .05 miles from tower 1 (in

26.

the geographic area that included the ATM) at 9:15 p.m. Marchyok noted that Friess's phone provided RTT data also placing it .05 miles from tower 1 at 9:14 and 9:16 p.m. The ATM video shows that the front-seat passenger in M.K.'s car is pointing a gun at her, and that she hands him money that she gets from the ATM. Marchyok said that the gun in the video was consistent with the shape and size of the gun found at Chad's house. The face of the person holding the gun is in the shadows and cannot be identified in the video, but the person appears to be wearing light-colored pants and a dark coat or jacket.

{¶ 67} The video of Chad's house showed someone walking in front of the house from the direction of South Avenue at 9:39 p.m. Beginning at 9:40 p.m., three people walk from the side of the house or the driveway, turn away from South Avenue, and walk past the front of the house. The first person walks by at 9:40 p.m., the second person walks by at 9:41 p.m., and the third person walks by at 9:42 p.m. At 9:43 p.m., a dark-colored vehicle drives toward South Avenue from the direction the three people were walking. During approximately the same time—from 9:33 to 9:52 p.m.—Friess's phone was using tower 2, and its RTT data covered a geographic area that included the location of M.K.'s body.

{¶ 68} At 9:56 p.m., two people walk past the front of Chad's house from the direction opposite South Avenue and walk up the driveway.

{¶ 69} From 10:11 to 10:30 p.m., Friess's phone provided RTT data that placed him in a geographic area that included the alley off Prouty Avenue where M.K.'s car was burned, but the RTT data did not place Friess's phone exclusively in that geographic area.

27.

At 10:35 p.m., two more people walk past the front of Chad's house from the direction opposite South Avenue and walk up the driveway. Beginning at 10:36 p.m., Friess's phone used tower 1 with RTT data that encompassed the area around Chad's house and Lido Lanes. At 10:38 p.m., someone walked up Chad's driveway from the direction of South Avenue. Marchyok said that Prouty Avenue, the location where M.K.'s car was burned, is in the same direction as South Avenue. A neighbor reported the car fire at 10:47 p.m.

### H. Manufactured alibi

{¶ 70} The state presented Radford's testimony regarding Friess's attempts to manufacture an alibi for the night of November 8. Radford and Friess met on a dating app in October 2019. She had known him for approximately three weeks and they met in person three or four times before Friess was arrested. Radford got pregnant during this period and thought that Friess was the father. Although Radford miscarried, she led Friess to believe that she was still pregnant with, and eventually gave birth to, his child. She did not tell Friess about the miscarriage because, by the time it happened, she "had already gotten the letters about trying to lie about a case and [she] was getting scared and nervous."

{¶ 71} Despite their short acquaintance, Friess continued calling and writing to Radford after his arrest. Radford was familiar with Friess's handwriting and signature from his letters.

28.

{¶ 72} Beginning in early 2020, Friess sent Radford letters asking her to provide false information to the police. The first letter suggested that Radford tell the police that she and Friess were together and had sex in her car the night of M.K.'s murder as a way to "speed all of this up[,]" and asked her to "let [him] know" her thoughts on the "plan."

{¶ 73} In the next letter, Friess wrote that he "had a few things to alter in our story."

{¶ 74} In early March 2020, Friess sent a letter giving Radford instructions for calling Friess's defense attorney to anonymously report that she had information about M.K.'s murder and that she knew Friess did not do it. The letter also mentions Radford calling the Lucas County prosecuting attorney to give her the same information.

{¶ 75} In a second letter from the same date, Friess wrote "don't forget to throw away the letters that talk about the phone call. For real though, throw them out." He also asked if Radford had called the Lucas County prosecuting attorney and gave her a code for talking about the call when they spoke on the phone.

{¶ 76} In another letter, Friess sent Radford a hand-drawn map and specific details about the alibi he wanted her to create. For example, the map showed the alley by Chad's house where Radford would have parked, pointed out which streets were one-way, showed the route Radford would have taken, and included notes such as "[w]hen you pulled out of my brother's street, you remember what you thought was an abandoned building with parking lots on both sides."

29.

{¶ 77} The next letter that Radford read elaborated on the story. Among other things, Friess wrote that they met earlier in the day for lunch, he told her not to contact him by phone because his girlfriend was getting suspicious, he was in front of Chad's house talking to someone when she arrived, she joked that he looked like a lumberjack because of his red flannel coat, they had sex in her car, she left by 9:30 p.m., he mentioned that the person he was talking to when she arrived had borrowed his phone, and she smelled marijuana and alcohol on him that night. Friess also wrote that "[t]hey might threaten you that if you're lying you can go to jail and all that, but you've got to just ignore them. You doing this blows their case out the window. * * * You have to read this over and over until you know it by heart. * * * Study it closely. Read the notes on the map carefully."

{¶ 78} In the next letter, Friess added more details. He told Radford that she forgot her phone at home that night and she already knew how to get to Chad's house because they had met there before. He added that they had "four weeks before the next step in our plan" and that Radford should "not speak to [his] other friend." He again told her to memorize the details of the story.

{¶ 79} Additionally, Friess sent several letters telling Radford about the state's evidence against him, which he interpreted as insufficient to convict him of the murder. He also denied involvement in M.K.'s murder several times and said that he felt guilty because M.K. was at Lido Lanes to meet him.

30.

{¶ 80} Despite Friess's references to "our plan," Radford said that she was not involved in creating the alibi and did not follow Friess's instructions to throw away the letters. Eventually, Marchyok contacted Radford, and she told him about Friess's attempts to get her to provide an alibi.

{¶ 81} After Radford began cooperating with the police, she received a threatening letter. The letter was not dated or signed, but Radford thought she got it in late July or early August.[3] Radford did not say who she thought the letter came from, and the prosecutor did not ask. The state's only questions related to the author were whether "[a]t any point in time [Radford] kn[e]w if Mr. Friess learned that [she was] cooperating with the State and the police department[,]" and how she found out that Friess knew she was cooperating with the state. Radford could not remember whether the letter came in the envelope with "Jonny Walker" or "Boogy-Man" in the return address. The letter said,

> Kristen Radford. Why? You had no reason to do what you did.
> You already lied to him and made him believe you had his baby. Trust me,
> he knows now. I hope you know how bad that hurt him. Then for no
> reason you go and give those letters to the cops. Did you know they are
> trying to put him in prison for life? He did not do this. He did not murder
> this woman, that I know for a fact. But you know that, don't you?

---

[3] Radford did not testify to the year she received the letter.

So you think you can take someone I love and get away with it, no chance. I lose—I lose him, that means you lose someone. Hug [your son] now. I'm a take what you love most. You won't be able to watch him all the time. This is your own doing. If you want your son safe and to see his next birthday then you better not testify. It's easy. They can't make you take the stand. To be sure, leave town. Go to see your family in Iowa. Fake COVID. Do whatever, but don't show up. Think of [your son]. I'll be watching you.

{¶ 82} Radford admitted that the handwriting of the threatening letter was different from Friess's letters. The handwriting of the threatening letter is similar—but not identical—to the handwriting of the letters from Friess that Radford read into the record. And the handwriting on the Boogy-Man envelope appears consistent with the handwriting of the threatening letter (e.g., both use open circles to dot lower-case Is and both write Fs backwards).

{¶ 83} Friess's attorney objected to the admission of the envelopes and letter. He argued that the state was using them as other-acts evidence in violation of Evid.R. 404(B) to show that Friess had threatened someone or tried to intimidate a witness. The state responded that the letter showed consciousness of guilt. The court determined that the letter was relevant to and an "integral part of" the case, so it overruled Friess's objection.

{¶ 84} On cross, Radford confirmed that she maintained a relationship with Friess while he was in jail by writing him letters and visiting him, and continued to talk and

32.

write to him after he asked her to lie about his alibi.  Although Radford claimed that the alibi was not her plan, she never told Friess that she would not lie for him.  She acknowledged that Friess told her multiple times that he did not commit the murder and was scared about the situation, and she repeatedly told him that she needed him to come home.  She admitted that she lied to Friess and his family about having a baby despite miscarrying.

{¶ 85} During a phone call from the jail the evening following Radford's testimony, Friess and the other caller (presumably Chad) talked about the letters discussed in court that day.  The state played two clips (one 12 seconds long and the other four seconds long) from the 20-minute phone call.  In the first clip, Friess said, "I never denied that I wrote them letters, but literally I was stressed about everything, I was trying to figure out a way to save my brothers * * *."  In the second, the other person on the phone said, "it's not your handwriting, nor your signature, nor from you * * *."  As the other person is making this comment, Friess says, "Oh yeah, the threatening letter[.]"[4]

### I. Jailhouse confession

{¶ 86} Magrum met Friess while they were incarcerated at the Lucas County jail.  In return for his testimony, the state allowed Magrum to plead guilty in a pending case to lower-level felonies, with the goal of Magrum avoiding a prison sentence.  The court in Magrum's case sent him to prison anyway, which, Magrum believed, negated his

---

[4] The clip ended before Friess finished this sentence.

33.

obligation under his agreement with the state. Regardless, Magrum testified against Friess because he "fe[lt] like it's the right thing."

{¶ 87} Regarding the information that Friess shared about this case, Magrum said that Friess "didn't go into too many details, but enough to know that I know he was serious." Friess discussed robbing M.K. of money that was "supposed to be from the bank" and said that he took M.K.'s purse and put it in a trashcan next to "a house he was at or living in." He also said that he "stabbed her enough times to make sure she wouldn't come back, and he told [Magrum] about the car being burned so nobody knew where it was." Friess burned clothing with the car. Magrum also remembered "conversation about a cellphone [Friess] had lost and went back to find."

{¶ 88} On cross, Magrum admitted that the "majority of" men in the jail lied about their cases, and claimed that he had not seen the discovery materials that the state provided to Friess. When Friess's attorney asked if Magrum recalled telling Kennedy that Chad was the person who took M.K. to the ATM to rob her, he responded that he was "having a hard time remembering" because it had been more than one and one-half years and he "was struck in the head with a lock in a sock * * * [and] was in a coma for a month and a half." Magrum acknowledged that his agreement with the state did not, in fact, release him from his obligation to testify if he was sentenced to prison. Additionally, Magrum admitted that, once he signed the agreement, the state did not object to the court modifying his bond so that he was released from jail pending trial, but

34.

said that he did not know he was going to be released from jail as part of the agreement. Magrum testified that he "didn't lie" to the police.

## J. Crim.R. 29 motion

{¶ 89} After the state rested, Friess moved for acquittal under Crim.R. 29. He argued that the state presented insufficient evidence to show that (1) he was involved in setting fire to M.K.'s car or was the person involved in kidnapping or robbing M.K.; (2) without evidence that he was involved in the robbery, the state lacked support for the murder charge predicated on the robbery; and (3) there was no evidence to support the firearm specifications, particularly the specification attached to the murder charge because there was no evidence that the murder was caused or attempted with a gun. The state responded that the testimony during trial was sufficient to make a prima facie showing of guilt of each charge.

{¶ 90} The court denied Friess's motion. It reasoned that "the State has given evidence, at least somewhat, as to each and every element of the crime charged and reasonable minds could reach different conclusions about whether the charges have been proven beyond a reasonable doubt." Regarding the firearm specifications, the court noted that the gun was visible in the ATM video, and, if the state's case was believed, M.K. and her passenger went from the ATM to the place where she was killed, so "reasonable minds could find that a gun was used in at least getting her to the location."

{¶ 91} Friess elected not to present any evidence, and rested after moving for acquittal.

35.

## K. Outcome

{¶ 92} The jury found Friess guilty of all charges and firearm specifications.

{¶ 93} At sentencing, the trial court imposed a term of life in prison without the possibility of parole for the aggravated murder conviction, indefinite terms of 11 to 16.5 years for the aggravated robbery and kidnapping convictions, a definite term of 18 months for the arson conviction, and a definite term of three years for each of the firearm specifications. The court ordered Friess to serve all sentences consecutively. The court also dismissed the repeat violent offender specifications attached to the aggravated murder, aggravated robbery, and kidnapping convictions.

{¶ 94} Friess now appeals, raising four assignments of error:

> I. The trial court abused its discretion and erred to the prejudice of Appellant by allowing the state to introduce improper 404(B) evidence.

> II. The trial court abused its discretion by denying Appellant's motion for a mistrial.

> III. The trial court erred in denying Appellant's Crim.R. 29 motion.

> IV. The jury's verdict was against the manifest weight of the evidence presented at trial.

## II. Law and Analysis

### A. The trial court did not abuse its discretion by admitting evidence about the threatening letter.

{¶ 95} In his first assignment of error, Friess argues that the trial court erred by allowing the state to introduce evidence of other acts. Specifically, he contends that the

36.

threatening letter Radford testified to receiving constituted improper evidence under Evid.R. 404(B) because it was evidence of other acts that the state admitted to show Friess's "violent character based on his criminal history"; its connection to Friess was "tenuous," making the letter irrelevant to the proceedings; and its probative value did not substantially outweigh the danger of unfair prejudice.

{¶ 96} The state responds that it offered the letter for a permissible purpose—to show Friess's consciousness of guilt—it was relevant because Friess sent the letter after learning that Radford was cooperating with police, and the letter was not unfairly prejudicial.

### 1. Applicable law

{¶ 97} Before reaching Friess's argument, we must clarify the applicable law. Although both parties argue that Evid.R. 404(B) governs admission of the letter, "in Ohio, the rationale for allowing admission of witness intimidation evidence developed separately from the 404(B) approach * * *." *State v. Echols*, 2023-Ohio-2206, --- N.E.3d ----, ¶ 47 (1st Dist.) (Bergeron, J., concurring). Generally speaking, evidence that a defendant threatened or intimidated a witness is admissible as evidence of the defendant's consciousness of guilt—without considering the Evid.R. 404(B) framework. *Id.*, citing *State v. Eaton*, 19 Ohio St.2d 145, 160, 249 N.E.2d 897 (1969) ("It is to-day universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." (Internal quotation omitted.)); and

37.

*State v. Richey*, 64 Ohio St.3d 353, 357, 595 N.E.2d 915 (1992) (expanding the conduct constituting consciousness-of-guilt evidence in *Eaton* to include threatening a participant in the case). This is because "evidence of witness intimidation is admissible as admission by conduct, permitting introduction of this evidence as a matter of course rather than requiring an Evid.R. 404(B) analysis to determine its admissibility on a case-by-case basis." *Id.*, citing *State v. Hamm*, 1st Dist. Hamilton Nos. C-160230 and C-160231, 2017-Ohio-5595, ¶ 20; and *Richey* at 357. Here, the letter, with its attempt to prevent Radford from testifying, is most properly classified as witness-intimidation evidence offered to prove Friess's consciousness of guilt, not general other-acts evidence under Evid.R. 404(B). Although evaluating such evidence under Evid.R. 404(B) might be a sounder approach, *see id.* at ¶ 44-54, we are constrained to consider the evidence under the framework from *Eaton* and *Richey*.

{¶ 98} Turning to that analysis, "the admission of evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 62, citing *State v. Issa*, 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001). Abuse of discretion means that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State ex rel. Askew v. Goldhart*, 75 Ohio St.3d 608, 610, 665 N.E.2d 200 (1996).

{¶ 99} Although threats against a witness are generally admissible under *Eaton* and *Richey*, they are only admissible "if it is shown that the accused was connected to

38.

such threats." (Emphasis deleted.) *State v. Baldwin*, 6th Dist. Wood No. WD-18-064, 2021-Ohio-84, ¶ 45; *State v. Grimes*, 1st Dist. Hamilton No. C-030922, 2005-Ohio-203, ¶ 55 ("Ordinarily, intimidation must be shown by evidence of the defendant's specific acts to that end."); *State v. Williams*, 8th Dist. Cuyahoga No. 89461, 2008-Ohio-1948, ¶ 25 ("Attempts by persons other than the accused to suppress evidence is admissible against the accused where the accused is connected to such attempts."); *State v. Walker*, 55 Ohio St.2d 208, 215, 378 N.E.2d 1049 (1978), quoting *Mefford v. State*, 13 Ohio App. 106, 107 (1st Dist.1920) ("'Attempts by persons other than the accused * * * to suppress or manufacture evidence, are evidence against the accused when, but only when, it is proven that he was connected with such attempts. Acts and statements of third persons, not known or authorized by him, are inadmissible.'").

{¶ 100} When it comes to anonymous threats, the case law is not explicit about the amount of evidence needed to connect the defendant to the threat. However, in other contexts, courts have required the state to present sufficient evidence to link the defendant to the act. *See, e.g., State v. Giles*, 6th Dist. Lucas No. L-20-1076, 2021-Ohio-2865, ¶ 26-37 (for Evid.R. 901 purposes, note delivered to codefendant while in jail that addressed codefendant and delivery person by their street names, said it was from someone with defendant's street name, and included details matching those in defendant's case was connected to defendant); *State v. Williams*, 5th Dist. Stark No. 2019CA00188, 2021-Ohio-443, ¶ 45-54 (for Evid.R. 901 purposes, unsigned note found in jail hallway was connected to defendant because a guard found it in an area where

39.

codefendant worked, it gave a detailed account of things happening in defendant's trial, and it "use[d] first person to refer to the defendant in the trial, who could only be Appellant"); *State v. Cross*, 4th Dist. Jackson No. 13CA3, 2014-Ohio-5605, ¶ 26-27 (for Evid.R. 404(B) purposes, anonymous letters were connected to the defendant in part because handwriting expert opined that they were written by the defendant); *State v. Bias*, 2022-Ohio-4643, 204 N.E.3d 639, ¶ 85-86, 145 (10th Dist.) (for Evid.R. 804(B)(6) purposes, defendant connected to letter texted to witness by unknown person based on content and handwriting; letter also admissible as evidence of consciousness of guilt); *Moran v. Radtke*, 10th Dist. Franklin No. 11AP-604, 2012-Ohio-1379, ¶ 12 (for Evid.R. 401 purposes, anonymous letters in defamation case not connected to defendant because "the authorship of these other letters was speculative" and "[n]o clear proof" indicated that defendant wrote the letters); *see also State v. Gordon*, 152 Ohio St.3d 528, 2018-Ohio-259, 98 N.E.3d 251, ¶ 28 (in misjoinder case, Supreme Court mentioned that witness who could testify that defendant was the only person to see a video that was posted online would be material to showing consciousness of guilt). *Compare State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 90 (evidence of defendant's reaction to the presence of police before he committed crimes was not admissible as evidence of consciousness of guilt because "there was no connection between [his] reaction to the police and the charged offenses").

40.

**2. The threatening letter is sufficiently connected to Friess.**

{¶ 101} For the threatening letter to be admissible as consciousness-of-guilt evidence, the state was required to connect the letter to Friess. To make that connection, the state presented the letter and two envelopes, Radford's testimony, DNA evidence from one of the envelopes, and two snippets of a phone call Friess made after Radford testified. Taken together, these items demonstrate that Friess is sufficiently linked to the letter.

{¶ 102} First, although Radford testified that the handwriting of the threatening letter was not the same as Friess's handwriting, it looks very similar to the handwriting in Friess's alibi letters to Radford with the exception of a few variations (e.g., lower-case Is dotted with circles and backwards Fs). Radford is not a handwriting expert, the trial court was free to make its own assessment regarding the similarity of the handwriting when determining the admissibility of the threatening letter, and the handwriting of the threatening letter—on its face—appears similar to Friess's handwriting in the other letters.

{¶ 103} Second, when Radford turned her letters over to police, she gave them two envelopes that might have contained the threatening letter. One envelope has a return address from "Jonny Walker" at the address of the Lucas County Jail. The handwriting on this envelope looks like Friess's handwriting in the alibi letters. The other envelope has a return address from "Boogy-Man" at a fake address made up of Radford's street address in Toledo, instead of her street address in the city where she

41.

lives. The handwriting on this envelope is very similar to (but not identical to) Friess's handwriting in the alibi letters. Additionally, the handwriting on both envelopes contains nearly-identical sized lettering, and the address and return address on both envelopes are formatted in a uniquely-similar way—so much so that if you placed one envelope on top of the other, the addressee, street address, city, state, and ZIP code of both the address and return address would be in virtually the same location.

{¶ 104} Third, the seal of one of the envelopes had Friess's DNA profile on it. Altizer, BCI's DNA analyst, did not know whether the swab with Friess's DNA came from the Jonny Walker envelope or the Boogy-Man envelope, so she could not say whether Friess's DNA was on the Jonny Walker envelope or the Boogy-Man envelope. But this is largely immaterial considering the similarity in the handwriting and the formatting of the envelopes; the fact that Friess's DNA was on one of the two incredibly-similar envelopes is enough to create a sufficient link to Friess.

{¶ 105} Fourth, the clip of the phone call Friess made after Radford testified—in which he said, "I never denied that I wrote them letters * * *"—can reasonably be interpreted as an admission that he wrote *all* of the letters Radford testified about, including the threatening letter. An admission of authorship is more than sufficient to show a connection between a defendant and a threat.

{¶ 106} Finally, the content of the threatening letter is sufficient to support an inference that Friess sent it. The letter contains information that Friess would have known (such as Radford cooperating with police and turning over Friess's alibi letters

42.

and the name of Radford's child) and information specific to Friess and Radford's relationship (such as Radford misleading Friess about her pregnancy) which supports a finding that Friess was the author.

{¶ 107} In summary, the evidence that the state presented to connect Friess to the threatening letter was (1) the unsigned, undated letter in handwriting that Radford did not recognize as Friess's, but which looks very similar to his handwriting in the alibi letters; (2) two envelopes, one from Jonny Walker at the Lucas County jail and one from Boogy-Man at a nonexistent address, that are formatted in the same, slightly unusual way; (3) handwriting on the Jonny Walker envelope that looks like Friess's usual handwriting, and handwriting on the Boogy-Man envelope that looks very similar to Friess's usual handwriting; (4) Friess's DNA on the seal of one of the two strikingly-similar envelopes, but no information about which envelope the DNA was on; (5) Friess's statement in the phone call that he "never denied that [he] wrote them letters, * * *" which can reasonably be interpreted to mean the alibi letters *and* the threatening letter; and (6) information in the threatening letter that points to Friess (or someone associated with him) being the author.

{¶ 108} Taken together, this is sufficient evidence connecting Friess to the threatening letter. Thus, the trial court did not act unreasonably, arbitrarily, or unconscionably by admitting the letter and Radford's testimony about it. Friess's first assignment of error is not well-taken.

43.

**B. The trial court did not err by failing to declare a mistrial.**

{¶ 109} In his second assignment of error, Friess argues that the trial court erred by failing to declare a mistrial twice during his jury trial: once sua sponte when Radford read an improperly-redacted letter from Friess, and once when Magrum commented about robberies charged in a different case. The state responds that the trial court did not abuse its discretion because the remarks were brief and isolated, the court gave curative instructions to the jury, and the risk of prejudice to Friess was low.

{¶ 110} Granting or denying a mistrial rests in the sound discretion of the trial court because the trial judge is in the best position to determine if the situation in the courtroom warrants a mistrial. *State v. Glover*, 35 Ohio St.3d 18, 19, 517 N.E.2d 900 (1988). Thus, we generally review the trial court's decision for an abuse of discretion. *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001).

{¶ 111} However, when an appellant alleges that the trial court erred by not declaring a mistrial sua sponte, we review only for plain error. *State v. Towns*, 6th Dist. Williams No. WM-19-023, 2020-Ohio-5120, ¶ 90, citing *State v. Davis*, 6th Dist. Ottawa No. OT-09-032, 2010-Ohio-4383, ¶ 71; and *State v. Franklin*, 62 Ohio St.3d 118, 127-128, 580 N.E.2d 1 (1991). Plain error is an error that affects an appellant's substantial rights. Crim.R. 52(B). An error that affects substantial rights is one that "affected the outcome of the trial." *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). Plain error should be found "only in exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Hill*, 92 Ohio St.3d 191, 203, 749 N.E.2d 274

44.

(2001), citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 112} A mistrial should not be ordered "merely because some error or irregularity has intervened * * *." (Internal quotation omitted.) *State v. Parker*, 6th Dist. Lucas No. L-18-1238, 2020-Ohio-4607, ¶ 99. Instead, a mistrial is necessary only when a fair trial is no longer possible. *Id.*, citing *Franklin* at 127. That is, "[t]he trial court should declare a mistrial only when there is a manifest necessity, there is no reasonable alternative, and the public interest in fair trials designed to end in just judgments is best served by ordering a mistrial." (Internal quotations omitted.) *State v. Scott*, 6th Dist. Sandusky No. S-19-030, 2020-Ohio-4854, ¶ 19, citing *State v. Gonzalez*, 6th Dist. Huron No. H-99-002, 1999 WL 1101976, *3 (Dec. 3, 1999); and *State v. Widner*, 68 Ohio St.2d 188, 189, 429 N.E.2d 1065 (1981).

### 1. Failure to sua sponte declare mistrial

{¶ 113} Friess first argues that the trial court should have declared a mistrial of its own volition during Radford's testimony when she read a portion of a letter from Friess that the state improperly redacted. At the end of a paragraph in which Friess discussed his wellbeing, Radford read the line "[t]hen on top of it, though, my lawyer says the aggravated robberies—[.]" Friess's trial counsel objected before Radford read more of the letter or commented on "the aggravated robberies," but did not move for a mistrial. Friess contends—without providing any other argument or rationale for finding plain

error—that "this certainly provided grounds for the trial court to order a mistrial sua sponte." We disagree.

{¶ 114} Radford's mention of "aggravated robberies" could not have affected the outcome of the trial, and, thus, does not show plain error. Friess was charged in this case with aggravated robbery, and Radford read the statement from a letter in which Friess primarily discussed this case. Without more context or other testimony indicating that Friess was referring to separate robberies or a different case, a passing mention that Friess wrote the phrase "aggravated robberies" does not indicate that he could no longer receive a fair trial. Additionally, the trial court, at the state's request, struck the comment about aggravated robberies and instructed the jury to disregard it. We presume that jurors follow the court's instructions, including instructions to disregard testimony. *Parker* at ¶ 102. Friess has not pointed to anything to overcome the presumption that the jurors followed the court's instruction to disregard. Because Friess has not shown that Radford's comment prejudiced his right to a fair trial, we conclude that the trial court did not commit error—let alone plain error—by failing to sua sponte declare a mistrial during Radford's testimony.

### 2. Motion for a mistrial

{¶ 115} Friess also argues that the trial court erred by denying his motion for a mistrial during Magrum's testimony. At that point, Magrum was discussing things he claimed that Friess told him while they were in jail together:

[Prosecutor:] Did he talk about the robbery?

46.

[Magrum:]  Yes, sir, he did.

[Prosecutor:]  Can you describe that conversation?

[Magrum:]  It was a Family Dollar.

After objecting, Friess's attorney moved for a mistrial, arguing that Magrum's comment was "about the fifth time this particular thing has been brought up by various witnesses throughout the case"—despite the court determining before trial that evidence of other robberies was inadmissible.  On appeal, Friess argues, without elaborating, that "his substantial right to a fair trial was jeopardized * * *" by the trial court denying his motion for a mistrial.  Again, we disagree.

{¶ 116} When the defendant seeks a mistrial based on impermissible testimony about other acts, the trial court does not abuse its discretion by denying the motion if the reference to the other acts was brief and isolated, the remarks were followed by a curative instruction, and the likelihood of prejudice is low.  *State v. Durst*, 6th Dist. Huron No. H-18-019, 2020-Ohio-607, ¶ 47, citing *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 174-175; and *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995).  This can be true even when there are several references to improper evidence.  *See State v. Wilson*, 6th Dist. Huron No. H-13-002, 2014-Ohio-1005, ¶ 9-23 (no plain error when trial court failed to declare a mistrial, despite several references to inadmissible evidence by two witnesses).

{¶ 117} Here, there were arguably three references to other robberies that preceded Friess's motion for a mistrial.  The first was when Morris (the dog sitter), in

47.

response to the prosecutor's question about why she lied to the detectives about Friess's whereabouts on November 8, said, "I was scared. They—they had told me they were there to investigate a robbery for—I believe, it was the Family Dollar." The second was Radford reading the phrase "my lawyer says the aggravated robberies" from one of Friess's letters. And the last was Magrum's comment that the robbery the prosecutor asked about "was a Family Dollar." Defense counsel objected to each statement immediately. Following each objection, the trial court struck the statement from the record and gave the jurors a curative instruction telling them to disregard the stricken statement. Friess does not attempt to point to any evidence suggesting that these brief references affected the outcome of the trial—i.e., that but for the comments, the jury would have found him not guilty—and without evidence that Friess could not receive a fair trial after the jury heard Magrum's comment about a robbery at Family Dollar, the trial court did not abuse its discretion by denying Friess's motion for a mistrial.

{¶ 118} Friess's second assignment of error is not well-taken.

**C. The trial court did not err by denying Friess's Crim.R. 29 motion.**

{¶ 119} In his third assignment of error, Friess argues that the trial court erred by denying his Crim.R. 29 motion for acquittal. He contends that his convictions are not supported by sufficient evidence because "[t]here were no witnesses in this case, no direct forensic links to [him], no DNA, no fingerprints, no bloody clothing or footprints and no weapons located." He also implies that the state's circumstantial evidence related to the cellphones is based on unsupported, stacked inferences.

48.

**{¶ 120}** The state responds that (1) the cellphone location data and ATM video show that Friess kidnapped M.K. by using a gun to force her to drive from Lido Lanes to the ATM; (2) the cellphone data, ATM video, and gun found at Chad's house show that Friess robbed M.K. using a deadly weapon; (3) the cellphone data, Magrum's and Morris's testimony, the nature of M.K.'s injuries, M.K.'s possible time of death, video from Chad's house, Friess's lack of "any meaningful alibi[,]" and the consciousness of guilt evidenced by Friess's attempt to get Radford to provide an alibi and sending her a threatening letter show that Friess purposefully killed M.K. while committing or fleeing after committing kidnapping or aggravated robbery; and (4) the cellphone data, video from Chad's house, presence of ignitable liquid in M.K.'s car, and Magrum's testimony show that Friess committed arson.

**{¶ 121}** A motion for acquittal under Crim.R. 29(A) challenges the sufficiency of the evidence. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 39. The denial of a motion for acquittal under Crim.R. 29(A) "is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

**{¶ 122}** Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable

49.

doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker*, 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978).

### 1. Kidnapping

{¶ 123} To convict Friess of kidnapping, the trial court was required to find that Friess, by threat, moved M.K. or restrained her liberty for the purpose of facilitating the commission of aggravated murder, aggravated robbery, arson, or some combination of them. R.C. 2905.01(A)(2). A defendant has purpose in two scenarios: (1) when it is his specific intention to cause a certain result; and (2) when the offense prohibits certain conduct, it is his specific intention to engage in that conduct, regardless of what he intends to accomplish. R.C. 2901.22(A). A threat includes "a range of statements or conduct intended to impart a feeling of apprehension in the victim, whether of bodily harm, property destruction, or lawful harm, such as exposing the victim's own misconduct." *State v. Cress*, 112 Ohio St.3d 72, 2006-Ohio-6501, 858 N.E.2d 341, ¶ 39. Restraint, in the context of kidnapping, means limiting or restraining the victim's freedom of movement. *State v. Turvey*, 2023-Ohio-2248, --- N.E.3d ----, ¶ 74 (6th Dist.), citing *State v. Logan*, 2017-Ohio-8932, 101 N.E.3d 572, ¶ 12 (3d Dist.); and *State v. Williams*, 2017-Ohio-5598, 93 N.E.3d 449, ¶ 19 (10th Dist.). Restraint does not need to be for any specific duration or in any specific manner. *Id.* Holding a victim at gunpoint can constitute both a threat and restraint. *State v. Johnson*, 11th Dist. Trumbull No.

50.

2001-T-0078, 2002-Ohio-2977, ¶ 25; *State v. Tapia*, 6th Dist. Lucas No. L-99-1212, 2002 WL 126085, *5 (Feb. 1, 2002); *State v. Banks*, 10th Dist. Franklin No. 03AP-1286, 2004-Ohio-6522, ¶ 27.

{¶ 124} The majority of the evidence against Friess was circumstantial. Circumstantial evidence has the same probative value as direct evidence, so a conviction can be based, in whole or in part, on circumstantial evidence. *State v. Aekins*, 2023-Ohio-322, 207 N.E.3d 934, ¶ 74 (10th Dist.). As long as the inferences required by the circumstantial evidence are reasonable—i.e., they are supported by the facts in evidence—the circumstantial evidence is sufficient to support a conviction. *State v. DeGenero*, 2017-Ohio-624, 85 N.E.3d 170, ¶ 18-19 (11th Dist.).

{¶ 125} At trial, the state presented evidence that (1) Friess and M.K. planned to meet the night of November 8; (2) cellphone data placed their phones in the same general geographic areas over the course of the evening; (3) both phones were in an area consistent with Lido Lanes around the time they planned to meet; (4) shortly after, the phones were in an area consistent with the ATM at the same time; (5) M.K. drove her car to the ATM; (6) the person in the car with M.K. at the ATM (whose face is not visible in the video) is white and was pointing a gun at her while she made withdrawals from the ATM; (7) a gun consistent with the size and shape of the gun in the ATM video and that had M.K.'s and Chad's DNA—but not Friess's DNA—on it was recovered at Chad's house; and (8) Chad could not have been the passenger in M.K.'s car because he has tattoos on his hands, but the passenger did not have tattoos.

51.

**{¶ 126}** Taken together, this evidence supported each element of the kidnapping charge. A reasonable fact finder could infer that Friess met M.K. at Lido Lanes, pulled a gun on her, got in the car with her, and threatened her with the gun to drive to the ATM, and that he did so for the purpose of robbing M.K. of the money she was going to withdraw. Therefore, we find that Friess's kidnapping conviction is supported by sufficient evidence, and the trial court did not err by denying his Crim.R. 29 motion on this count.

## 2. Aggravated robbery

**{¶ 127}** To convict Friess of aggravated robbery, the state was required to prove that Friess, in committing a theft offense, had a deadly weapon on or about his person or under his control and that he displayed, brandished, indicated that he possessed, or used the weapon. R.C. 2911.01(A)(1). Theft is a theft offense for purposes of R.C. 2911.01(A). R.C. 2913.01(K)(1). To prove that Friess committed theft, the state was required to prove that Friess, with purpose to deprive M.K. of money, knowingly obtained control over the money by threat or intimidation. R.C. 2913.02(A)(4), (5). A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. R.C. 2901.22(B). A gun is both a deadly weapon and a firearm. *In re Marcus T.D.*, 6th Dist. Lucas No. L-02-1376, 2004-Ohio-477, ¶ 9; R.C. 2923.11(A), (B); *see also State v. Vondenberg*, 61 Ohio St.2d 285, 289, 401 N.E.2d 437 (1980) (trier of fact can draw reasonable inferences about the deadly nature of a weapon used in the commission of a crime).

52.

{¶ 128} The evidence that the state used to support the aggravated robbery charge is the same as the evidence supporting the kidnapping charge, with the additional fact that Magrum testified that Friess talked about robbing M.K. of money that was "supposed to be from the bank" and said that he took her purse. This evidence proved each element of aggravated robbery. A reasonable factfinder could infer that Friess met M.K. at Lido Lanes, got in the car with her, rode to the ATM, and displayed or brandished the gun to threaten or intimidate M.K. into withdrawing and giving him money. Thus, Friess's aggravated robbery conviction is supported by sufficient evidence, and the trial court did not err by denying his Crim.R. 29 motion on this count.

### 3. Aggravated murder

{¶ 129} To convict Friess of aggravated murder, the state was required to prove that Friess purposely caused M.K.'s death while committing, or fleeing after committing, aggravated robbery. R.C. 2903.01(B).

{¶ 130} In addition to the evidence supporting the kidnapping and aggravated robbery charges, the state presented (1) the autopsy report indicating that M.K. was stabbed 24 times, her cause of death was multiple stab wounds, and the manner of death was homicide; (2) testimony from Marchyok that he believed M.K. was killed where her body was found; (3) cellphone data that put Friess's phone in a location consistent with the area where the body was found for a period of time; (4) calls and texts between Chad's and Haefner's phones to Friess's phone that used towers near the area where the body was found; (5) video of Chad's house showing figures coming and going

53.

throughout the night; (6) testimony from Morris that Friess came home around 12:30 a.m. on November 9 wearing different clothes; (7) a slew of letters from Friess to Radford concocting an alibi for her to give to the police; (8) the threatening letter Radford received; (9) Friess's comment on the jail call that he "never denied that [he] wrote them letters * * *"; and (10) testimony from Magrum that Friess said that he "stabbed her enough times to make sure she wouldn't come back, * * *" and mentioned "a cellphone he had lost and went back to find."

{¶ 131} Viewing it in a light most favorable to the state, this evidence, if believed, is sufficient to support the aggravated murder conviction. A reasonable factfinder could believe that M.K. was killed where her body was found, infer that Friess was with M.K. at the murder scene, and believe Magrum's testimony that Friess confessed to stabbing a woman. This, combined with the evidence supporting the kidnapping and aggravated robbery charges, is sufficient to show that Friess caused M.K.'s death while committing or fleeing after committing aggravated robbery. Thus, Friess's aggravated murder conviction is supported by sufficient evidence, and the trial court did not err by denying his Crim.R. 29 motion on this count.

### 4. Arson

{¶ 132} To prove that Friess committed arson, the state was required to prove that Friess knowingly, by means of fire or explosion, caused physical harm to M.K.'s property without her consent. R.C. 2909.03(A)(1). "Property" is "any property, real or personal, tangible or intangible * * *." R.C. 2901.01(A)(10)(a). "Physical harm to

54.

property" is "any tangible or intangible damage to property that, in any degree, results in loss to its value or interferes with its use or enjoyment." R.C. 2901.01(A)(4).

{¶ 133} To support the arson charge, the state presented evidence that (1) M.K.'s car was set on fire the night of November 8; (2) TFD determined that the fire was arson; (3) BCI found evidence of gasoline in the backseat and cargo compartment of the burnt car; (4) although the cellphone data showed Friess's phone in many locations over the period when the car was likely started on fire, several data points intersected over the location where the car was burnt; (5) the video from Chad's house showed figures coming and going at times consistent with Marchyok's timeline for the fire; and (6) Magrum testified that Friess "told [Magrum] about the car being burned so nobody knew where it was[,]" and that he had burned clothing with the car.

{¶ 134} This evidence, if believed, supports each element of arson. The burnt car clearly belonged to M.K., and there is compelling evidence that it was intentionally started on fire. Based on the cellphone records, a reasonable factfinder could infer that Friess took the car to the alley where it was discovered and was the one who started it on fire. If the state's evidence is believed, the fire started sometime after M.K. was murdered, so a reasonable factfinder could also infer that M.K. did not consent to her car being burned. Thus, Friess's arson conviction is supported by sufficient evidence, and the trial court did not err by denying his Crim.R. 29 motion on this count.

55.

## 5. Firearm specifications

{¶ 135} Finally, to convict Friess of the firearm specifications, the state was required to prove that Friess had a firearm on or about his person or under his control and displayed, brandished, indicated that he possessed, or used the firearm to facilitate the offense. R.C. 2941.145(A).

{¶ 136} As already discussed, it is reasonable to infer from the evidence that Friess was in M.K.'s car when she was at the ATM. The passenger in the car was holding a gun that was visible on the video. The evidence supported two crimes that occurred from the time M.K. left Lido Lanes until the end of the ATM video—kidnapping and aggravated robbery—so it is reasonable to infer that Friess had (and used) the gun during the course of the kidnapping and robbery. Thus, the firearm specifications attached to the kidnapping and aggravated robbery charges are supported by sufficient evidence, and the trial court did not err by denying Friess's Crim.R. 29 motion on these specifications.

{¶ 137} Further, if the state's timeline is believed, it is reasonable to infer that Friess took M.K. directly from the ATM to the place where she was murdered, so it is also reasonable to infer that Friess still had the gun on or about his person or under his control at the time of the murder. Accordingly, the firearm specification attached to the aggravated murder charge was supported by sufficient evidence, and the trial court did not err by denying Friess's Crim.R. 29 motion on this specification.

{¶ 138} Friess's third assignment of error is not well-taken.

56.

**D. Friess's convictions are supported by the weight of the evidence.**

{¶ 139} In his final assignment of error, Friess argues that his convictions are not supported by the manifest weight of the evidence. He contends that the jury "did not fully consider and properly weigh all the evidence * * * prior to determining his guilt" because, he claims, (1) there was "was no forensic evidence, or evidence of any kind, * * *" showing that he had a firearm, or that he was at the ATM, the body's location, or the burnt car's location; (2) the cellphone location data was only "speculative regarding [Friess's] physical presence at different locations * * *"; (3) TPD discounted the ex-boyfriend as a suspect "almost immediately," despite his history of threats against M.K.; (4) he was cooperative with police and provided consistent statements to officers and M.K.'s family; (5) the police did not recover the knife used to kill M.K. and could not forensically link the gun from Chad's house to him; (6) the ATM video and photos do not identify him as M.K.'s passenger; (7) Radford "was dishonest about almost everything in her testimony"; (8) none of the video evidence conclusively identifies him; (9) Magrum, the jailhouse informant, is a convicted felon who received favorable treatment in exchange for his testimony; (10) no forensic evidence linked him to the fire in M.K.'s car; (11) Morris lied to the police of her own volition, not because Friess asked or told her to lie; (12) there were no weapons, bloody footprints, tire tracks, or signs of dragging where the body was found; and (13) the coroner could not determine M.K.'s time of death. Essentially, what Friess's arguments boil down to is his belief that "the state built its case on inferences stacked upon inferences."

57.

{¶ 140} The state responds that "competent, credible evidence indicates [Friess] committed these gruesome crimes."

{¶ 141} When we review a claim that a verdict is against the manifest weight of the evidence, we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. We do not view the evidence in a light most favorable to the prosecution. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 387. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 142} Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the jury's credibility determinations, given that it is the jury that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14. The jury, as the finder of fact and the sole judge of the weight of the evidence and the credibility of the witnesses, may believe or

58.

disbelieve all, part, or none of a witness's testimony. *State v. Caudill*, 6th Dist. Wood No. WD-07-009, 2008-Ohio-1557, ¶ 62, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶ 143} After carefully reviewing the evidence and the credibility of the witnesses and weighing the testimony, we are not convinced that this is an exceptional case in which the evidence weighs heavily against a conviction. Although Friess complains that his conviction is based "on inferences stacked upon inferences[,]" he does not point to any specific "inferences stacked upon inferences" to support his argument. Moreover, direct and circumstantial evidence have the same probative value, and a conviction can be based solely on circumstantial evidence. *Aekins*, 2023-Ohio-322, 207 N.E.3d 934, at ¶ 74; *State v. Thompson*, 6th Dist. Lucas Nos. L-19-1077 and L-19-1244, 2020-Ohio-3131, ¶ 20, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus; and *Franklin*, 62 Ohio St.3d at 124, 580 N.E.2d 1. Friess does not explain how the jury improperly relied on the circumstantial evidence that the state presented.

{¶ 144} On the whole, we cannot say that the jury lost its way when it convicted Friess. Accordingly, Friess's convictions are not against the manifest weight of the evidence, and his fourth assignment of error is not well-taken.

## III. Conclusion

**{¶ 145}** Based on the foregoing, the April 14, 2022 judgment of the Lucas County Court of Common Pleas is affirmed. Friess is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.


A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Christine E. Mayle, J.

_____
JUDGE

Myron C. Duhart, P.J.

_____
Charles E. Sulek, J.                            JUDGE
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.